658 A.2d 702

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. CHARLES MARSHALL BERRY, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. DWAYNE CANNON, DEFENDANT–APPELLANT.

Argued May 4, 1994—Reargued September 27, 1994— Argued September 27, 1994—Decided May 4, 1995.

*Paul H. Heinzel,* Deputy Attorney General, argued the cause for appellant State of New Jersey (*Deborah T. Poritz,* Attorney General of New Jersey, attorney).

*Matthew Astore,* Deputy Public Defender II, argued the cause for appellant Dwayne Cannon (*Susan L. Reisner,* Acting Public Defender, attorney).

*M. Virginia Barta,* Assistant Deputy Public Defender, argued the cause for respondent Charles Marshall Berry (*Susan L. Reisner,* Acting Public Defender, attorney).

*Jeffrey Garrigan,* Assistant Prosecutor, argued the cause for respondent State of New Jersey (*Carmen Messano,* Hudson County Prosecutor, attorney).

*Deborah Bartolomey,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey in *State v. Cannon* (*Deborah T. Poritz,* Attorney General, attorney).

The opinion of the Court was delivered by

STEIN, J.

These appeals concern the State's practice of using expert witnesses in drug-distribution cases to explain techniques commonly used by drug dealers. The expert testimony typically is offered to enhance the jury's understanding of the factual evidence proffered by the State to prove the commission of the offenses charged in the indictments.

In *State v. Berry,* the sole question presented in the State's appeal, here by virtue of a dissent in the Appellate Division, see *Rule* 2:2–1(a)(2), is whether defendant's convictions for possession of cocaine and possession with intent to distribute were based on sufficient evidential support in the record. In an unpublished disposition the Appellate Division majority reversed the conviction, holding that the State's expert's opinion could not properly have been used "to convert presence in a vehicle into active participation." The dissenter below, pointing out that the State's expert had testified that defendant had "'without a question, possessed [the drugs] for the sole purpose of selling them,'" concluded that abundant evidence established defendant's guilt. Although the admissibility of the expert's testimony was not directly posed, we listed the case for reargument, together with

*State v. Cannon,* to afford counsel the opportunity to address the issue of admissibility.

In *Cannon,* the Appellate Division in a published opinion, 271 *N.J.Super.* 391, 638 *A.2d* 915 (1994), reversed a pretrial ruling in a drug-distribution prosecution barring the State from introducing expert testimony concerning distribution methods commonly used by street-level drug dealers. We granted defendant's motion for leave to appeal. See *Rule* 2:2–2.

I

## Berry

On August 1, 1990, at approximately 3:40 p.m., James Steiger, a New Jersey State Police Officer, stopped a 1984 Buick traveling westbound on Interstate 80. The officer was parked at the Fletcher Avenue U-turn in the Borough of Fort Lee observing southbound express-lane traffic on Interstate Highway 95 and westbound traffic on Interstate Highway 80. As the 1984 Buick passed his vantage point, the officer noticed that the left portion of the front windshield was cracked and that yellow dice were hanging from the rear-view mirror. The officer stopped the car for violating *N.J.S.A.* 39:3–74 (requiring "unobstructed" windshield) and *N.J.S.A.* 39:3–75 (prohibiting "unduly fractured" windshield).

The driver, defendant Charles Marshall Berry, told the officer his name and gave him a vehicle-registration card and an insurance card, both of which belonged to Gracie Lyde, whom Berry identified as his girlfriend. Berry could not, however, produce his driver's license. Berry was "extremely nervous" and would not look Officer Steiger "in the eye" when he spoke to him. Moreover, Berry's "hands were trembling." As a result, Officer Steiger asked Berry to exit the car and, after Berry complied, he conducted a pat-down search of Berry. He then asked the passenger in the front seat, A.C., to exit the car. While the officer was speaking to A.C., he noticed that he had a plastic bag in his mouth,

which the officer directed him to spit out. After he spat the bag to the ground, Officer Steiger saw that "the plastic bag contained a yellow chunky substance [that he] suspected to be crack cocaine." Subsequent laboratory analysis revealed that the rock-like substance found in A.C.'s mouth was 17.90 grams (.63 ounces) of cocaine. The officer then conducted a pat-down search of A.C. and told him to stand next to Berry in front of the car. The officer ordered the passenger in the backseat, L.K., out of the car and conducted a pat-down search of L.K. The officer then arrested all three occupants for possession of cocaine.

Officer Steiger transported defendant and his passengers to the Totowa Barracks, where he ascertained that A.C. and L.K. were juveniles. The officer then conducted a search incident to the arrest of the suspects, and found a "plastic bag containing one-hundred small, clear plastic bags in [A.C.'s] left sock." He also issued two summonses to Berry for the motor-vehicle violations.

Berry was charged on a two-count indictment with violating *N.J.S.A.* 2C:35–5a(1), b(2) (possession of cocaine with intent to distribute) (count one), and *N.J.S.A.* 2C:35–10a(1) (possession of cocaine substance) (count two). At trial, Officer Steiger and Sergeant Michael Carlino, a member of the Bergen County Narcotics Task Force, testified for the State. Officer Steiger testified essentially to the facts and circumstances surrounding the arrest. Sergeant Carlino testified that he has been with the Bergen County Prosecutor's Office for "approximately fourteen years, seven of which [he] spent with the Bergen County Narcotic Task Force." He stated that he had been involved in approximately 800 cocaine-related investigations and had made "[h]undreds" of cocaine-related arrests. At the time of trial, he was a supervisor with the Bergen County Narcotics Task Force and supervised approximately thirty undercover investigators. The trial court accepted Sergeant Carlino as an expert in "narcotics and narcotics distribution," and Sergeant Carlino's expert testimony was introduced without objection.

The prosecutor questioned Sergeant Carlino about the distribution of cocaine in the context of a hypothetical set of facts that mirrored the facts and circumstances described in Officer Steiger's testimony. Sergeant Carlino testified that the quantity of cocaine described would typically be broken down into powder form, diluted, and sold in packets ranging in weight from one-tenth of a gram to one-half ounce. He stated that New Jersey drug dealers involved with large quantities of cocaine—ten ounces or more—would probably attempt to purchase the drugs in New York City because the price was lower, and that dealers distributing smaller quantities would buy their cocaine from New Jersey suppliers. Sergeant Carlino testified that the quantity of cocaine described by Officer Steiger could be purchased in New York City for approximately $900, and if that cocaine were broken down and sold in New Jersey in one-tenth of a gram packets its value would be approximately $1800. Sergeant Carlino stated that zip-lock plastic bags of the type found in A.C.'s sock are used to package cocaine for resale as crack.

Sergeant Carlino was asked about the significance, in the hypothesized facts, of there being three occupants in the vehicle, two of whom were juveniles. He testified that drug dealers traveling to New York City to purchase drugs often are accompanied by one or two associates for reasons of safety, and he stated that juveniles are often used as "mules" to carry the drugs so that in the event of apprehension the dealer can avoid serious criminal charges. He testified that juveniles frequently serve as "runners" or "steerers" for drug distributors, but rarely can afford to spend as much as $900 to purchase a large quantity of cocaine. Sergeant Carlino also expressed the opinion that based on the value and high quality of the cocaine, "there's no question that this cocaine was possessed for the sole purpose of resale for distribution."

On cross-examination, defense counsel asked Sergeant Carlino whether "Charles Berry possessed that cocaine with the intent to distribute." The prosecutor objected to that question, contending that it would be improper for Sergeant Carlino to testify about a

legal conclusion. On recross-examination, defense counsel again asked whether "with any degree of certainty * * * any particular person possessed those drugs with the intent to distribute?" Sergeant Carlino responded that "all three defendants in the vehicle, without a question, possessed these items for the sole purpose of selling them, repackaging this cocaine into these packets for resale." He then stated, "If you're asking my opinion as to your client or the other two individuals, it was my opinion that they all possessed this cocaine with the intent to resell it." On redirect-examination, "[t]o insure that the question [was] properly placed before the jury," the prosecutor asked Sergeant Carlino whether it was his "opinion that the adult-male driver in the hypothetical question possessed the cocaine in question with the intent to distribute." He answered that he believed that that driver possessed the cocaine with the intent to distribute.

The jury returned a guilty verdict on both counts. The trial court sentenced Berry to ten-years imprisonment on count one, and merged count two into count one. The Appellate Division reversed Berry's convictions, concluding that the evidence was insufficient to sustain the jury's verdict, whereas the dissenting member was of the view that the verdict was amply supported by the State's proofs.

### Cannon

Because this appeal concerns a pre-trial evidentiary ruling by the trial court, we summarize the facts primarily on the basis of a proffer by the Assistant Prosecutor concerning the testimony that he expected to elicit at trial from Sergeant Phil Zacche of the Jersey City Police Department. Members of the Jersey City Police Department Narcotics Task Force established surveillance of the intersection of Wilkerson Avenue and Martin Luther King Drive in Jersey City. Sergeant Zacche observed defendant Dwayne Cannon standing on the northwest corner of that intersection. He saw codefendant Ronald McQuarters approach the corner on a bicycle and engage in a brief conversation with

Cannon. They proceeded west on Wilkerson Avenue a short distance, whereupon McQuarters handed Cannon money for what appeared to be several vials of cocaine. McQuarters left the area, proceeding south on Martin Luther King Drive. Sergeant Zacche radioed McQuarters's description and route to other police officers, who then stopped and searched him. The search revealed four vials of cocaine.

Sergeant Zacche then observed Cannon hand the money he had received from McQuarters to an unidentified male wearing a shiny green jacket with a black hood and jeans, who immediately left the area proceeding south on Martin Luther King Drive. Sergeant Zacche radioed that person's description and route to the other task-force members, but he was never located. Cannon was subsequently arrested and searched, but the police found neither money nor drugs.

Cannon was charged with possession of cocaine, contrary to *N.J.S.A.* 2C:35–10a(1) (count one); possession of cocaine with the intent to distribute, contrary to *N.J.S.A.* 2C:35–5a(1) and 2C:35–5b(3) (count two); possession of cocaine within 1,000 feet of school property with the intent to distribute, contrary to *N.J.S.A.* 2C:35–5a(1) and 2C:35–7 (count three); distribution of cocaine, contrary to *N.J.S.A.* 2C:35–5a(1) and 2C:35–5b(3) (count four); and distribution of cocaine within 1,000 feet of school property, contrary to *N.J.S.A.* 2C:35–5a(1) and 2C:35–7 (count five).

During jury selection, the trial court conducted a pretrial hearing to determine whether the State would be permitted to offer the expert testimony of Jersey City Police Detective Richard Vogel at Cannon's trial. The Assistant Prosecutor explained that the State intended to elicit expert testimony concerning techniques commonly used by street-level drug dealers, specifically including the use of a so-called "money man" to whom the drug dealer transfers the proceeds of drug sales. The proposed expert testimony would explain that through the use of a "money man" a drug dealer can avoid the risk of being apprehended while in possession of both drugs and large sums of money, presumably

diminishing the likelihood of being charged with serious drug-distribution offenses. The Assistant Prosecutor contended that the proposed expert testimony would provide a frame of reference that would enhance the jury's ability to understand the testimony to be offered by Sergeant Zacche, the officer who had observed the drug transaction.

The trial court determined that the State could not offer the expert testimony during its direct case, noting that the scope of the expert's testimony was not beyond the jury's common fund of knowledge. The trial court also observed that the prejudicial impact of the proposed expert testimony outweighed its probative value. Finally, the trial court noted that the testimony might be admissible as rebuttal evidence in the event defendant offered evidence that provided an independent explanation for the transfer of money to the unidentified third person.

The Appellate Division reversed, observing that "[t]he act of passing money by defendant to a third person would be meaningless to a jury unless they were aware of its significance in the drug trade. Expert testimony is helpful for the jury to understand the 'modus operandi' of drug traffickers." 271 *N.J.Super.* at 396, 638 *A.*2d 915.

## II

Our discussion of the permissible uses of expert testimony in drug distribution cases starts with *N.J.R.E.* 702, which follows verbatim *Fed.R.Evid.* 702, and provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." In *State v. Kelly*, 97 *N.J.* 178, 478 *A.*2d 364 (1984), focusing on the first sentence of former *Evidence Rule* 56(2) (which, except for minor language changes, was identical with *N.J.R.E.* 702), we set forth three basic requirements for the admission of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.

> [*Id.* at 208, 478 *A.*2d 364.]

At the outset, we confront the suggestion advanced by some commentators that the standard of admissibility of expert testimony described in *Kelly, supra,* is narrower than that contemplated by *Fed.R.Evid.* 702, which, like its New Jersey counterpart, limits admissibility only to expert testimony that "will assist the trier of fact to understand the evidence or to determine a fact in issue." See 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 7.02[02], at 702–15 (1988) ("Must a court exclude expert testimony if the subject is within the comprehension of the average juror? Such a test is incompatible with the standard of helpfulness expressed in Rule 702."); Deon J. Nossel, Note, *The Admissibility of Ultimate Issue Expert Testimony by Law Enforcement Officers in Criminal Trials,* 93 *Colum.L.Rev.* 231, 234 (1993) ("Rule 702's standard of admissibility is significantly more liberal than that of the common law, which permitted expert testimony only regarding subjects 'beyond the ken of the jury' or 'not within the common knowledge of the average layman.' "). In our view, the evolution of *Evidence Rule* 56(2), the predecessor to *N.J.R.E.* 702, as well as our case law, demonstrate that the "helpfulness" standard of *Fed.R.Evid.* 702 is imbedded in our own jurisprudence concerning admissibility of expert testimony.

Prior to the 1981 amendment to *Evidence Rule* 56(2) (which became effective July 1, 1982), the Rule contained no standard for admissibility of expert testimony. It then provided:

> (2) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (a) based primarily on facts, data or other expert opinion established by evidence at the trial and (b) within the scope of the special knowledge, skill, experience or training possessed by the witness.

> [*Evid.R.* 56.]

The *Report of the New Jersey Supreme Court Committee on* *Evidence*, 106–07 (1963) explains the omission of a standard for admissibility:

> The Rule does not describe, as the Model Code rule did, when an expert testifies as such and who is qualified to testify as an expert. Model Code Rule 402 provided: "A witness is an expert witness and is qualified to give expert testimony if the judge finds that to perceive, know or understand the matter concerning which the witness is to testify requires special knowledge, skill, experience or training, and that the witness has the requisite special knowledge, skill, experience or training." This appears to be such well-settled law that there is no need to state it in Rule 56.

The language that limits admissibility to expert testimony that "will assist the trier of fact to understand the evidence or determine a fact in issue" originated with *Fed.R.Evid.* 702 and was incorporated into *Evidence Rule* 56(2) by the 1981 amendment. See *State v. Gunter*, 231 *N.J.Super.* 34, 41, 554 *A.*2d 1356 (App. Div.), *certif. denied*, 117 *N.J.* 80–81, 563 *A.*2d 841 (1989). However, the standard of helpfulness that we imported from the Federal Rule had been "widely accepted by our courts even before the rule amendment." Biunno, *Current N.J. Rules of Evidence*, comment 1 on *N.J.R.E.* 702 (1994–95). As this Court noted in *Rempfer v. Deerfield Packing Corp.*, 4 *N.J.* 135, 72 *A.*2d 204 (1950):

> Was the expert testimony concerning profits admissible or did it encroach upon the function of the trial jury? The true test of admissibility of such testimony is not whether the subject matter is common or uncommon or whether many persons or few have knowledge of the matter; but it is whether the witnesses offered as experts have peculiar knowledge or experience not common to the world which renders their opinions founded on such knowledge or experience any aid to the court or jury in determining the questions at issue.
>
> [*Id.* at 141–42, 72 A.2d 204.]

Testing the admissibility of expert testimony by focusing not only on the jury's comprehension of the subject matter but also on whether the specific proffered testimony will aid the jury in resolving factual issues has been a recurring theme in our cases. See *State v. Odom*, 116 *N.J.* 65, 70, 560 *A.*2d 1198 (1989); *State v. Zola*, 112 *N.J.* 384, 414, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989); *Kelly, supra*, 97 *N.J.* at 204, 478 *A.*2d 364; *Butler v. Acme Markets, Inc.*, 89 *N.J.* 270, 283, 445 *A.*2d 1141 (1982); *Gunter, supra*, 231 *N.J.Super.* at 47, 554 *A.*2d 1356; *Nesta v. Meyer*, 100 *N.J.Super.* 434, 442, 242

A.2d 386 (App.Div.1968). To the extent that there is a perceived need to bridge the gap, if any, between the standards that test expert-testimony admissibility on whether the subject is "beyond the ken of the average juror," *Kelly, supra,* 97 *N.J.* at 208, 478 A.2d 364, or on whether the testimony will "assist the trier of fact * * * to determine a fact in issue," *N.J.R.E.* 702, Justice Handler has provided a lucid reconciliation:

> The test for determining whether expert testimony can be offered is normally phrased in terms of whether the particular subject matter is beyond the understanding of the ordinary person. Sometimes it is asked in terms of whether expert testimony will assist the average juror to understand the evidence that has been presented.

> \* \* \* \* \* \* \* \*

> Disputes over admissibility are particularly sharp when expert testimony is offered to interpret matters that could be considered commonplace or conduct that could be accounted for commonsensically. When we are dealing with life's everyday experiences, it is not always easy to perceive why it is necessary to have an expert to explain things for us.

> \* \* \* \* \* \* \* \*

> In each of these cases, we are presented with individuals engaged in recurrent forms of human behavior—a wife who kills her husband out of fear and hostility, a child sexually molested by an elderly adult relative, natural parents desperately seeking exclusive control over their child. Yet, in each case we were invited to believe that our understanding of these events was inaccurate or too simplistic, that true insight into what really happened was too elusive. These cases point out the deceptiveness of the ordinary; they illustrate how the familiar, when probed, can become esoteric, the commonplace, unusual, and the obvious, obscure. Each is a case in which there is more, considerably more, than meets the eye.

> In these situations experts are called on to explain things that are suddenly or surprisingly or seemingly made complicated and profound; experts are needed to give us understanding and insight because conventional wisdom no longer serves. However, when the underlying knowledge of such matters is genuinely unsettled, when the experts themselves are in disarray, we may question whether the decision in a given case informed by the opinions of experts will reflect the truth. Experts can hold justice hostage.

> [Alan B. Handler, *The Judicial Pursuit of Knowledge: Truth And/Or Justice,* 41 *Rutgers L.Rev.* 1, 5, 8, 10–11 (1988) (footnote omitted).]

Thus, expert opinion is admissible if the general subject matter at issue, or its specific application, is one with which an average juror might not be sufficiently familiar, or if the trial court determines that the expert testimony would "assist the jury

in comprehending the evidence and determining issues of fact." *Odom, supra,* 116 *N.J.* at 70, 560 *A.*2d 1198. The proposed expert witness must be adequately qualified and possess sufficient knowledge and experience to express an opinion and explain its basis to the jury. *Id.* at 71, 560 *A.*2d 1198; *Kelly, supra,* 97 *N.J.* at 208, 478 *A.*2d 364. Ordinarily, the necessity for and admissibility of expert testimony are matters to be determined within the sound exercise of discretion by the trial court. *Zola, supra,* 112 *N.J.* at 414, 548 *A.*2d 1022.

▇ Reported opinions in New Jersey have not previously addressed the specific question whether expert testimony explaining the *modus operandi* of drug dealers should be admissible in the prosecution of drug-distribution offenses. The general rule in the federal courts favors admissibility of such evidence. "Federal courts often permit experts to testify on narcotics operations because jurors are commonly unfamiliar with the methods by which drug dealers attempt to conceal their activities." *United States v. Dunn,* 846 *F.*2d 761, 763 (D.C.Cir.1988); *see, e.g., United States v. Boney,* 977 *F.*2d 624, 628–29 (D.C.Cir.1992) (holding admissible expert testimony that identified "seller," "runner," and "holder" in hypothetical drug transaction that replicated government's trial proof); *United States v. Roldan–Zapata,* 916 *F.*2d 795, 804–05 (2d Cir.1990) (upholding admissibility of expert testimony concerning drug-related function of ledger, shoe boxes, and other items seized from defendant's apartment and explaining narcotics dealers' use of "beepers" to avoid detection), *cert. denied,* 499 *U.S.* 940, 111 *S.Ct.* 1397, 113 *L.Ed.*2d 453 (1991); *United States v. Campino,* 890 *F.*2d 588, 593 (2d Cir.1989) (upholding trial court's ruling admitting expert testimony concerning drug dealers' use of electronic surveillance equipment similar to that found at defendants' apartment and testimony that seized notebooks contained records of amounts owed by customers for cocaine transactions), *cert. denied,* 494 *U.S.* 1068, 110 *S.Ct.* 1787, 108 *L.Ed.*2d 788 (1990); *United States v. Tutino,* 883 *F.*2d 1125, 1133–34 (2d Cir.1989) (holding admissible expert witness testimony generally

describing heroin-distribution methods and interpreting organized-crime terminology heard on tape-recordings introduced in evidence), *cert. denied*, 493 *U.S.* 1081, 110 *S.Ct.* 1139, 107 *L.Ed.*2d 1044 (1990); *United States v. Diaz*, 878 *F.*2d 608, 616–18 (2d Cir.) (sustaining admission of expert-witness testimony concerning characteristics of narcotics "stash pad" and providing interpretation of financial records seized at residence used for drug distribution), *cert. denied*, 493 *U.S.* 993, 110 *S.Ct.* 543, 107 *L.Ed.*2d 540 (1989); *Dunn, supra*, 846 *F.*2d at 762–63 (sustaining trial court's admission of expert testimony explaining that vials, wax-paper bags, I-beam scales, measuring spoons, and manitol were customarily used by narcotics dealers for drug-distribution purposes); *United States v. Espinosa*, 827 *F.*2d 604, 611–13 (9th Cir.1987) (upholding admissibility of expert testimony that apartment rented by another was used by defendant as narcotics "stash pad," that ledgers found in apartment contained names of cocaine customers, and that exchange of packages witnessed by police officers constituted delivery of narcotics for money), *cert. denied*, 485 *U.S.* 968, 108 *S.Ct.* 1243, 99 *L.Ed.*2d 441 (1988); *United States v. Resto*, 824 *F.*2d 210, 211–12 (2d Cir.1987) (upholding sufficiency of evidence to support defendant's conviction for aiding sale of narcotics, including expert testimony explaining that "steerer" typically stands short distance from dealer to solicit and screen potential buyers and guide them to dealer); *United States v. Cruz*, 797 *F.*2d 90, 96 (2d Cir.1986) (sustaining admissibility of expert testimony concerning practice of exchanging food stamps for narcotics); *United States v. Khan*, 787 *F.*2d 28, 34 (2d Cir.1986) (upholding trial court's admission of expert testimony concerning customs of narcotics dealers in Pakistan, including testimony about heroin prices and transfers of heroin with payment deferred); *United States v. Daniels*, 723 *F.*2d 31, 32–33 (8th Cir. 1983) (holding admissible expert-witness testimony that drug dealers commonly register cars and apartments in names of female friends to conceal narcotics activities); *United States v. Pugliese*, 712 *F.*2d 1574, 1578–82 (2d Cir.1983) (sustaining admission of expert testimony concerning quantity and purity of heroin used

by addicts in context of defendants' contention that heroin seized was imported for personal use and not for distribution); *United States v. Fleishman,* 684 *F*.2d 1329, 1335–36 (9th Cir.) (holding admissible expert testimony that defendant's actions were consistent with role of "lookout" in drug-distribution conspiracy), *cert. denied,* 459 *U.S.* 1044, 103 *S.Ct.* 464, 74 *L.Ed.*2d 614 (1982); *United States v. Maher,* 645 *F*.2d 780, 783–84 (9th Cir.1981) (upholding admission of expert testimony comparing defendant's activities to those of persons conducting counter-surveillance while transporting drugs).

A number of state courts have applied similar reasoning in concluding that expert testimony concerning the *modus operandi* of drug dealers would be likely to enhance the jury's ability to understand the evidence adduced. *See, e.g., State v. Salazar,* 27 *Ariz.App.* 620, 557 *P*.2d 552, 557 (1976) (holding admissible expert testimony concerning counter-surveillance techniques commonly used by narcotics dealers, specifically including practice of using vehicle to observe in advance area where distribution was intended to occur); *State v. Vilalastra,* 207 *Conn.* 35, 540 *A*.2d 42, 46–48 (1988) (holding admissible police officer's expert testimony that seized cocaine of eighty-three percent purity would be "cut" with lactose to achieve lesser purity prior to street-level distribution); *State v. Avila,* 166 *Conn.* 569, 353 *A*.2d 776, 780–81 (1974) (upholding as admissible state toxicologist's testimony that quantity and purity of seized heroin, if diluted and packaged, was sufficient to supply 22,400 bags of heroin appropriate for street-level distribution); *Benefield v. State,* 140 *Ga.App.* 727, 232 *S.E.*2d 89, 93–94 (1976) (holding admissible police officer's expert testimony that narcotics dealers often use intermediary in making delivery to buyer under mistaken assumption that intermediary would insulate dealers from criminal liability); *State v. Olsen,* 315 *N.W.*2d 1, 7 (Iowa 1982) (sustaining admissibility of expert testimony that quantity of marijuana found in defendant's possession could be diluted and profitably distributed to others); *Butler v. State,* 19 *Md.App.* 601, 313 *A*.2d 554, 560 (1974) (sustaining admissibility of police officers' expert testimony concerning use of "stash house" by narcotics dealers to store drugs for future distribution).

Despite the general acceptance of the admissibility of *modus operandi* expert testimony in the prosecution of drug cases, the federal courts have noted their apprehension about the inappropriate uses of such testimony. In *United States v. Castillo*, 924 *F.*2d 1227 (1991), the Court of Appeals for the Second Circuit reversed the defendants' convictions for carrying a firearm during commission of a drug-trafficking offense in violation of 18 *U.S.C.A.* § 924(c), on the ground that the improper admission of expert testimony had materially prejudiced the jury's verdict. The government's main witness, an undercover narcotics officer, testified that after he had purchased cocaine from the defendants, they had forced him to ingest some of the cocaine by threatening him with what had appeared to be a handgun. When police arrested the defendants minutes later, neither defendant possessed a firearm and no weapon was found in the apartment. At trial, an experienced narcotics detective testified as an expert about the techniques of New York drug dealers, and specifically testified about numerous occasions when drug dealers had used guns to make potential customers sniff cocaine, for the purpose of detecting police officers making undercover buys. Reversing the handgun-possession convictions because of the prejudicial effect of the expert testimony, the Court stated:

[W]e take serious issue with the Government's use of an expert witness to propound the impermissible theory that appellants' guilt could be inferred from the behavior of unrelated persons. We conclude that the government's misuse of what was, in any event, improperly admitted testimony, could only have had a substantial and injurious effect on the jury's count four verdicts. The firearm count was perhaps perceived as weak from the case's inception—no gun had ever been recovered, despite searches of appellants' persons, the apartment, the area outside the apartment windows and the vicinity of the arrest.... The jury's notes to the Judge during deliberations, manifesting their recognition that, in fact, the firearm count was troubling, are telling.... In view of the evidence on the count, the jury's obvious struggle, and the absence of any curative instruction from the court, we hold that the government's misuse of Santiago's testimony by its introduction, and heavy reliance on it in summation, improperly tipped the balance against appellants on the firearm charge.

[*Id.* at 1234–35 (footnote omitted).]

Similarly, in *United States v. Cruz*, 981 *F.*2d 659 (2d Cir.1992), the court of appeals reversed defendant Bonifacio's conviction for

various drug-distribution offenses on the ground that expert testimony about the role of brokers in facilitating drug purchases by upstate buyers from dealers in the Washington Heights area of New York City had been used improperly by the government in the presentation of its case. Bonifacio was implicated in the transactions by the testimony of defendant LaBoy, an Albany drug dealer, who testified that Bonifacio had on five occasions accompanied him to New York and made arrangements for LaBoy to purchase cocaine from Washington Heights dealers. Bonifacio's defense was that he had never been present at or arranged drug transactions for LaBoy, and that LaBoy had falsely accused him to obtain leniency from the government. The government's expert testified that drug dealers from upstate New York intending to purchase drugs from a dealer in Washington Heights typically relied on a broker or middleman who deals directly with the dealer. The expert testified that the broker generally arranges for delivery of the drugs to the buyer at a neutral location to protect the identity of both seller and buyer. In summation, the prosecutor argued that LaBoy's direct testimony about Bonifacio's role in arranging for his New York City drug purchases paralleled the usual procedure outlined by the government's expert witness. Reversing the defendant's conviction, the court of appeals noted that "the dispositive factual issue was whether Bonifacio was present at the drug transactions," and that accordingly "[t]he role of a broker * * * was simply not an issue that the parties disputed." *Id.* at 662. The court concluded that the government had adduced the expert testimony for the "impermissible and prejudicial" purpose of enhancing the credibility of LaBoy's version of the facts:

> We reaffirm here the principle that the credibility of a fact-witness may not be bolstered by arguing that the witness's version of events is consistent with an expert's description of patterns of criminal conduct, at least where the witness's version is not attacked as improbable or ambiguous evidence of such conduct.
>
> [*Id.* at 663.]

*N.J.R.E.* 704, like its counterpart *Fed.R.Evid.* 704(a), also authorizes the admission of expert testimony that encompasses ultimate issues to be decided by the trier of fact, *Odom, supra,* 116

*N.J.* at 77–81, 560 *A.*2d 1198 (interpreting predecessor to *N.J.R.E.* 704). Concerning the admissibility of expert testimony addressing an ultimate issue, we noted in *Odom* that "the dominant authority throughout the country has ruled that an expert witness may testify that a defendant possessed a controlled dangerous substance with the intent to distribute it, even if the opinion is expressed in the language of the statutory offense." *Id.* at 79, 560 *A.*2d 1198. However, a number of federal and state courts have expressed concern that under certain circumstances expert testimony in drug cases embracing ultimate issues might be so prejudicial as to require exclusion. The evidentiary rules allowing admission of expert testimony on ultimate issues repudiate the common-law rule precluding such testimony because it invaded the jury's province. See Nossel, *supra,* 93 *Colum.L.Rev.* at 235. Although admissible, such testimony may be excluded if its probative value is substantially outweighed by the risk of undue prejudice. *N.J.R.E.* 403(a); *see Fed.R.Evid.* 403. In drug prosecutions, that risk of prejudice has prompted courts to exercise caution in determining whether expert testimony touching on ultimate issues properly was admitted at trial.

In *United States v. Young,* 745 *F.*2d 733 (2d Cir.1984), *cert. denied,* 470 *U.S.* 1084, 105 *S.Ct.* 1842, 85 *L.Ed.*2d 142 (1985), the convictions of all but one defendant on charges of conspiracy to distribute heroin were sustained, as was the admissibility at trial of expert testimony, including the expert testimony of one of the investigating officers that an exchange of handbags that he had observed at a local hotel constituted a sale of drugs. Judge Newman, concurring, explained his concerns about the use of such testimony:

> I do not doubt that an experienced narcotics agent has the requisite knowledge to assist a jury by explaining "the clandestine manner in which drugs are bought and sold[.]" But I question whether an expert's opinion that the events he observes constitute a drug transaction provides very much, if any, assistance to a jury, beyond whatever inference is available to be drawn by the jury from all the evidence. . . .
>
> Even if admissible under Rule 702, opinion testimony is still subject to exclusion under Rule 403 "if its probative value is substantially outweighed by the danger of

unfair prejudice." Whatever slight probative value arises from a narcotics expert's personal opinion that an observed transaction involved a sale of drugs must be carefully weighed against the distinct risk of prejudice. The "aura of special reliability and trustworthiness" surrounding expert testimony, which ought to caution its use, especially when offered by the prosecution in criminal cases, poses a special risk in a case of this sort. That risk arises because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial. The risk is increased when the opinion is given by "the very officers who were in charge of the investigation[.]"

[*Id.* at 765–66 (citations omitted).]

Similarly, in *United States v. Brown,* 776 *F.*2d 397 (2d Cir.1985), *cert. denied,* 475 *U.S.* 1141, 106 *S.Ct.* 1793, 90 *L.Ed.*2d 339 (1986), the investigating officer was permitted to testify as an expert that street drug sales in Harlem generally involved the use of a "steerer," whose function it was to determine if a prospective buyer was a genuine customer or an undercover police officer, and also to express the opinion that one of the defendants (Brown) had functioned as a "steerer" in the drug transaction that was the subject of the prosecution. Judge Friendly's opinion for the court concluded that expert testimony about the function of a steerer was properly admitted. *Id.* at 400. Although observing that adequate evidence to sustain defendant Brown's conviction existed apart from the expert's testimony, the court expressed its concern about the admissibility of expert testimony describing Brown as a steerer:

The admission of Grimball's opinion testimony that Brown was fulfilling the role of a steerer raises a closer question. We recognize that Rule 704(a) * * * abolished the antiquated rule, more frequently honored in the breach than the observance, excluding expert testimony "because it embraces an ultimate issue to be decided by the trier of fact." However, there is something rather offensive in allowing an investigating officer to testify not simply that a certain pattern of conduct is often found in narcotics cases, leaving it for the jury to determine whether the defendant's conduct fits the pattern, but also that such conduct fitted that pattern, at least when other inferences could have been drawn not unreasonably although perhaps not as reasonably as that to which the expert testified. * * * Even though the testimony is not barred by F.R.E. 704(b), district judges should heed the Advisory Committee's Note to Rule 704:

The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These

provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.

We would thus agree with Judge Newman's precautionary observations about the admission of such testimony in *United States v. Young*, 745 *F*.2d 733, 765–66 (2 Cir.1984) (Newman, J., concurring), *cert. denied*, 470 *U.S.* 1084, 105 *S.Ct.* 1842, 85 *L.Ed.*2d 142 (1985), which we quote in the margin, and commend this for consideration by district judges.

[*Id.* at 400–01 (footnotes omitted).]

*See also United States v. Boissoneault*, 926 *F*.2d 230, 233 (2d Cir.1991) ("We have repeatedly expressed our discomfort with expert testimony in narcotics cases that not only describes the significance of certain conduct or physical evidence in general, but also draws conclusions as to the significance of that conduct or evidence in the particular case."); *United States v. Jones*, 913 *F*.2d 174, 177 (4th Cir.1990) (finding error in admission of expert testimony that concluded that because defendant fit profile of drug courier he therefore intended to distribute drugs in his possession), *cert. denied*, 498 *U.S.* 1052, 111 *S.Ct.* 766, 112 *L.Ed.*2d 785 (1991); *United States v. Quigley*, 890 *F*.2d 1019, 1023–24 (8th Cir.1989) (same), *cert. denied*, 493 *U.S.* 1091, 110 *S.Ct.* 1163, 107 *L.Ed.*2d 1066 (1990); *Vilalastra, supra*, 540 *A*.2d at 47–48 (finding error in admission of expert testimony that defendant possessed illegal drugs for sale rather than consumption); *State v. Ogg*, 243 *N.W.*2d 620, 621 (Iowa 1976) (finding error in admission of expert testimony that quantity of drugs possessed by defendant far exceeded quantity that "one might possess for personal use"); *State v. Wheeler*, 416 *So.*2d 78, 81–82 (La.1982) (reversing defendant's conviction because of admission of police officer's expert opinion that defendant was engaged in distribution of marijuana).

We also note that a number of courts, in reviewing the admissibility of expert testimony in drug prosecutions, endorse the use of limiting instructions that impress on the jury its right to reject the opinion of an expert witness. *See, e.g., Espinosa, supra*, 827 *F*.2d at 613; *United States v. Nersesian*, 824 *F*.2d 1294, 1309 (2d Cir.), *cert. denied*, 484 *U.S.* 957, 108 *S.Ct.* 355, 98 *L.Ed.*2d 380 (1987); *Young, supra*, 745 *F*.2d at 761 (Newman, J., concurring); *Daniels*,

*supra*, 723 *F.*2d at 33; *Odom, supra*, 116 *N.J.* at 82, 560 *A.*2d 1198. Our model jury charge incorporates a similar warning. *Model Jury Charges (Criminal)*, Expert Testimony (Apr. 18, 1977). In such cases, especially where the record includes both an innocent explanation for defendant's conduct as well as an expert witness's incriminating opinion about the same conduct, the trial court should carefully instruct the jury in the context of the evidence about its duty to decide whether to accept or reject the opinion of the expert witness.

Based on the prevailing authorities, and our own sense of the usefulness of expert testimony in drug prosecutions, we are persuaded that such testimony generally is to be admitted provided the trial court is satisfied that the testimony will assist the jury in resolving material factual issues. That general rule of admissibility, however, should be tempered by the trial court's heightened awareness that in certain circumstances the probative value of such expert testimony might be substantially outweighed by the risk of undue prejudice. That risk can be significant if the expert witness is one of the investigating officers and also offers an opinion on an ultimate issue in the case.

### III

In resolving the *Berry* appeal, we address two issues. The primary question, whether the evidence was sufficient to sustain Berry's convictions for possession of cocaine and possession with intent to distribute, divided the Appellate Division panel, the majority concluding that the proofs were insufficient. However, we first consider the admissibility of the expert testimony, an issue not raised at trial but within the scope of the questions addressed on reargument before us.

We regard Sergeant Carlino's direct testimony essentially as *modus operandi* expert testimony offered to assist the jury's understanding of techniques used by some New Jersey drug dealers in acquiring cocaine in New York City for distribution in this State. The specific facts included in Carlino's testimony,

about which the jury undoubtedly was uninformed, concerned the availability of cocaine at a lower cost in New York City, the street value of the cocaine in question if distributed in New Jersey, the purpose for which drug dealers use zip-lock plastic bags of the type found in A.C.'s sock, and the reasons why drug dealers use juveniles as "mules" to carry drugs on their person in the course of transport from New York City to New Jersey. There can be little question that an average juror would be unfamiliar with those finer points of drug acquisition and distribution techniques. Nor can there be any doubt that Sergeant Carlino's direct testimony would assist the jury in understanding the evidence and in resolving material factual issues. Absent the expert testimony, the jury might not adequately have appreciated the possibility that the cocaine and plastic bags possessed by the juvenile in the front seat were being held for Berry. Accordingly, if that issue were presented to the trial court, a ruling admitting Sergeant Carlino's direct testimony would have been entirely consistent with *N.J.R.E.* 702 and with the extensive body of case law holding admissible *modus operandi* expert testimony in drug prosecutions. *Supra* at 293–295, 658 *A.*2d at 708–710.

■ We note that Sergeant Carlino was asked on recross-examination whether "with any degree of certainty * * * any particular person possessed those drugs with the intent to distribute?" He responded that "all three defendants in the vehicle, without question, possessed these items for the sole purpose of selling them, repackaging this cocaine into these packets for resale." Sergeant Carlino added that "[i]f you're asking my opinion as to your client or the other two individuals, it was my opinion that they all possess this cocaine with the intent to resell it." If the same question and response were asked and elicited during direct testimony, the response might well have constituted an expression of opinion by the expert that *defendant is guilty of* the crime charged, see *Odom, supra,* 116 *N.J.* at 80, 560 *A.*2d 1198, and exclusion also might have been warranted because of the substantial risk of prejudice. *N.J.R.E.* 403. The point need not concern us, however, because except in the most extreme cases

trial errors originating with defense counsel will not present grounds for reversal on appeal. *See State v. Marshall,* 123 *N.J.* 1, 93, 586 *A.*2d 85 (1991); *State v. Buonadonna,* 122 *N.J.* 22, 44, 583 *A.*2d 747 (1991); *State v. Ramseur,* 106 *N.J.* 123, 281–82, 524 *A.*2d 188 (1987); *State v. Pontery,* 19 *N.J.* 457, 471, 117 *A.*2d 473 (1955).

■ Based on the state of the record, including Sergeant Carlino's expert testimony elicited during both direct- and recross-examination, we are persuaded that the jury had before it ample evidence to support defendant's conviction. Defendant's apparent nervousness when stopped, his lack of a driver's license or other identification, the large quantity of cocaine possessed by the juvenile in the front seat, combined with Sergeant Carlino's undisputed expert testimony were sufficient to support the jury's conclusion that defendant constructively had possessed the cocaine possessed by a juvenile in the front seat of a car driven by defendant, as well as the verdict that defendant was guilty of possession of cocaine and possession with intent to distribute.

■ The narrow issue presented by the *Cannon* appeal concerns the admissibility of *modus operandi* expert testimony intended to describe the common practice of street level drug dealers using a so-called "money man" to whom the drug dealer passes the money received from drug sales. The proposed testimony in *Cannon* would include the explanation that drug dealers who use a "money man" do so believing that that technique diminishes the dealer's risk of being charged with serious drug offenses, the dealer having avoided the possibility of being apprehended with both drugs and money. The trial court excluded the testimony on the assumption that the jury, as a matter of common knowledge, could have inferred from the direct testimony that the proceeds of the drug sale had been handed to an accomplice of defendant. The trial court also was concerned that the prejudicial impact of the testimony substantially outweighed its probative value.

Although trial courts ordinarily are entitled to wide latitude in exercising discretionary authority to exclude evidence because of

its potentially prejudicial impact, *State v. Carter,* 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982), the novelty and importance of the evidentiary issue, both generally and in drug prosecutions, compel us to intervene and order that the expert testimony be admitted. We do not doubt that some jurors could infer from the testimony of the fact witnesses that a nefarious relationship might have existed between defendant and the male in the shiny green jacket to whom defendant allegedly handed money. Nevertheless, jurors in general are totally unfamiliar with the techniques used by street-level drug dealers. Even if the testimony at trial tenders an innocent explanation for the transfer of money, the jury's ability to understand the trial testimony and to resolve any fact issues concerning the alleged money transfer will be enhanced by an understanding that at least a fair number of street-level drug dealers use a "money man" to limit their exposure to prosecution. Based on the standard we adopt, that such testimony generally should be admitted if it will assist the jury in resolving material factual issues, we are fully convinced that the proposed expert testimony meets that test. Concerning the risk of prejudice, we have no doubt that that concern adequately can be addressed by the trial court's qualifying instruction to the jury, framed in the context of the specific testimony adduced at trial, that conveys to the jury its absolute prerogative to reject both the expert's opinion and the version of the facts consistent with that opinion, or to rely on that opinion in resolving the material factual issues.

## IV

In *Berry,* we reverse the judgment of the Appellate Division and reinstate defendant's convictions, remanding the matter to the trial court for further proceedings. In *Cannon,* we affirm the judgment of the Appellate Division.

*For reversal and remandment in State v. Berry and affirmance in State v. Cannon*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, and GARIBALDI—6.

*Opposed*—None.