Smith, J.
(dissenting). Because I believe that the admission of expert testimony was unwarranted, prejudicial and unfair to *510 the defendant and because I believe further that the defendant established a prima facie case of racial discrimination which required the prosecutor to explain his peremptory challenges, I dissent.
Defendant was found guilty, after a jury trial, of the criminal sale of a controlled substance in or near school grounds in violation of Penal Law § 220.44 (2). The prosecution introduced evidence that the defendant, when approached by an undercover police officer, asked the officer what he wanted, and he answered four bags. The defendant allegedly reached into the waistband of her sweat pants, took out four bags and told him that she was keeping one for herself. The officer gave her $20 for the bags. Prior to the officer obtaining the crack cocaine, he had been ridiculed when he approached several men on a corner and asked them where he could obtain drugs. The officer was in a torn and dirty outfit and some of the men stated that he was a crackhead or a cop. A male allegedly pointed out the defendant and told the undercover officer that he could obtain drugs from her.
The defense in the case was mistaken identification. The defendant testified that she never sold crack cocaine. She stated that she had been with several girlfriends and that she went into a store to get change to use a public telephone. When she returned to the public telephone, she was arrested. No drugs or marked money were found on her. She had no prior criminal record.
Expert Testimony
Expert testimony is properly admitted to assist lay persons to understand matters that are not ordinarily within their understanding. Here, whatever the articulated reason for the introduction of the evidence, it was prejudicial and tipped the scale against the defendant. It should be remembered that defendant was not accused of a drug conspiracy or of being part of a drug organization. Yet, the effect of the admission of this evidence was to do just that — tie the defendant, without evidence, to a drug organization. No other person allegedly associated with defendant in the drug transaction was arrested.
In the expert testimony, a police officer described an organization selling drugs. He stated that the “pitcher” is a person who actually hands out the drugs, the “money man” keeps and protects the money, the “stash man” protects the narcotics, the *511 “lookout” watches for police or anyone else who might cause a problem, the “steerer” points out the person who has the drugs and the “manager” manages everybody. The effect of the testimony was to accuse defendant of being a participant in the organization.
There was no necessity for this expert testimony. In effect, all the expert testimony did was to suggest to the jury, again without proof, how defendant got rid of the marked money, the retained packet of cocaine she refused to give to the officer and any other drugs in her sweat suit. In admitting the expert testimony, the Trial Judge stated that he would give “a limiting instruction to the jury as to the purpose of the testimony and that the testimony is not being offered by anyone who was present who can say that this is what happened but it’s being offered to propose as a contention of the People an explanation as to why there’s no buy money recovered or stash.” This, in my view, reduced the People’s burden in the case. If the People contend that defendant was acting with someone else, they ought to prove it, not speculate upon it.
During summation, the prosecutor implied that the defendant was part of a drug organization. His words were as follows:
“But you now know, ladies and gentlemen, after hearing the testimony of both Detective Farro and the additional testimony of Sergeant Gary McDonald [the expert] * * *, there was about a four minute period that went by where nobody saw what the defendant was doing, that nobody saw where she went, that nobody saw who she was talking to, nobody saw whether she went into the grocery store.
‘You heard from Sergeant McDonald, he explained to you the nature of these types of operations, the nature of the street level drug trade.
“He explained to you what can happen to the prerecorded buy money, to additional drugs.
“Is that evidence in this case? For the substance of this case, of course not.
“Does it raise plausible reasons as to what may have happened to the prerecorded buy money? Of course it does, of course.”
*512 In its charge to the jury, the court stated that the expert’s testimony was based on facts the expert was . asked to assume. The court further charged the jury that Sergeant McDonald “was allowed to express his opinion concerning how street level drug sales are conducted.” The court also charged the following:
“He wasn’t testifying based on actual observation.
[He] wasn’t testifying as to what he actually observed or what actually occurred but he was testifying in an area that would otherwise be not known to the jury.
“It does concern a fact in issue and he was offering an explanation with regard to buy money and additional narcotics and this was the limited purpose for his testimony.”
Thus, in this case, the introduction of expert testimony was prejudicial, first, because it nullified the presumption of innocence by replacing it with a presumption of guilt in which the jury was given information on how defendant got rid of marked money and drugs. Moreover, the introduction of the expert testimony shifted the burden of proof from the prosecution to the defendant, requiring her to explain why the expert’s statements did not apply to her and leaving the jury to conclude that she had no explanation.
Expert testimony, similar to that admitted here, is admissible in some drug cases to explain to the jury some aspect of the case. For example, the standard in New Jersey for allowing such evidence is rule 702 of the New Jersey Rules of Evidence, which, in pertinent part, is identical to rule 702 of the Federal Rules of Evidence, and reads as follows: “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.” First, the New Jersey rule requires that the testimony concern a matter which is beyond the ken of the average juror, the subject must be such that the expert’s testimony may be considered reliable and the witness must have sufficient expertise to testify concerning the subject (State v Berry, 140 NJ 280, 289-290, 658 A2d 702, 706 [1995]).
Second, the facts of the case must lend themselves to expert testimony. Thus, in State v Cannon, decided with State v Berry, the evidence was that defendant Cannon gave drugs to a person *513 in return for money. Cannon then handed the money to another person. When Cannon was arrested, he had neither drugs nor money. The New Jersey Supreme Court permitted expert testimony, including testimony about the purpose of a “money man.”
Cases in the District of Columbia have permitted expert testimony under similar factual circumstances. In Thompson v United States (745 A2d 308 [DC Ct App 2000]), Thompson was observed handing something which turned out to be drugs to his codefendant who was also observed dropping the object to the floor of the vehicle they were sitting in. In Spencer v United States (688 A2d 412 [DC Ct App 1997]), the two defendants were conversing with each other when they were approached by the undercover police officer, and they each responded to the officer’s request for drugs, “a fact which strongly suggests that the two were acting in concert” (id. at 415). In Blakeney v United States (653 A2d 365 [DC Ct App 1995]), one defendant acted consistently with being a lookout and the other defendant actually gave the drugs to the undercover officer. In Lowman v United States (632 A2d 88 [DC Ct App 1993]), one defendant took the undercover police officer to the other defendant, who, when asked, responded that he had drugs and directed them to wait while he proceeded to get the drugs.
In United States v Brown (776 F2d 397, 400 [2d Cir 1985], cert denied 475 US 1141 [1986]), the Second Circuit allowed a police expert to testify that drug sales in Harlem usually involved two to five people and that one person is employed as a steerer to determine whether the buyer is an addict or cop. In this transaction, however, there was actual conversation between the initial seller and the steerer, evidencing the conspiracy and providing a foundation for admitting expert testimony. The police expert also was allowed to testify that defendant was exercising the role of a steerer.
Thus, expert testimony of this kind should be limited to cases where there is sufficient incriminating evidence of more than one person being involved in a drug transaction or sufficient incriminating evidence of a drug organization. Here, the evidence is insufficient. Defendant had no conversation or interaction with the man exiting the store. That she joined the group of men in bantering with the undercover officer is not enough.
In addition, the expert was allowed to testify to matters that were not beyond the understanding of the average juror. It is true that average jurors may be unfamiliar with the special *514 ized terminology used in narcotics street sales, such as “nicks” or “working the rock.” Such testimony is indeed helpful to the jury. But as the majority concedes, drug dealing in neighborhood streets is an altogether familiar scene to average jurors, particularly the average urban juror. It is a scene that is part of the “day-to-day experience.” It is not beyond the average juror’s understanding that drug dealers would “do everything they can to keep the money [or drugs] from * * * staying too long in the street where [they] can be seized” by the police. That drug dealers on neighborhood corners would minimize the risk of getting caught with drugs or prerecorded buy money by assigning a “money man,” a “stash man,” or “steerer,” is within the understanding of the average juror. This is not the kind of intricate drug operation requiring the explanation of an expert police officer. In the absence of an allegation that defendant was part of a conspiracy, this kind of expert testimony should not come in.
This case is distinguishable from People v Taylor (75 NY2d 277 [1990]), where we allowed expert testimony to explain why a rape victim would be unwilling to identify the defendant as the man who raped her, and why she had not seemed upset following the attack. Rape, we found, “is a crime that is permeated by misconceptions” (id. at 288). The patterns of response among rape victims are not within the ordinary understanding of the lay juror, because “cultural myths still affect common understanding of rape and rape victims” (id. at 289). In this case, there is no claim that the lay jurors’ understanding of the drug operation, of which defendant was allegedly a part, is permeated by misconceptions.
Racial Discrimination
It is also clear that the defendant made out a prima facie case of racial discrimination which required the prosecutor to give racially neutral reasons for peremptorily excluding the jurors. The exclusion of African Americans from juries has long been a problem in American courts. Few problems have been as great a threat to the fairness of the American jury system as the exclusion of African Americans on a racially discriminatory basis (Strauder v West Virginia, 100 US 303 [1879]). In recent years, both the Supreme Court of the United States and this Court have sought to protect the right of African Americans to serve on juries (Batson v Kentucky, 476 US 79 [1986], overruling Swain v Alabama, 380 US 202 [1965]; People v Kern, 75 NY2d 638 [1990]). In fact, Kern held both that the exclusion of *515 African Americans from juries violated the Equal Protection Clause of the New York State Constitution (art I, § 11) and that jury service is a civil right (art I, § 1; see also People v Allen, 86 NY2d 101, 108 [1995]). This Court stated in Kern:
“Jury service, by contrast, is a civil right established by Constitution and statute. First, jury service is a ‘privilege [] of citizenship’ secured to the citizens of this State by article I, § 1 of the State Constitution. Service on the jury has long been recognized to be both a privilege and duty of citizenship * * *. Indeed, it is because jury service is a means of participation in government that, in the words of Mr. Justice Black, ‘[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concept of a democratic society and a representative government’ (Smith v Texas, 311 US 128, 130)” (75 NY2d at 651-652 [citations omitted]).
The evidence was sufficient to require some explanation from the prosecutor. In the first round of jury selection, 15 jurors were subject to peremptory challenges. The record indicates that 9 of the 15 were African American. Of this number, eight were challenged, six by the prosecutor and two by the defense. Of the six, five were African Americans. Seven were seated as jurors. The prosecutor thus used 83% of his challenges against African Americans who constituted 60% of the initial jury venire. These numbers alone are sufficient to raise a prima facie case of jury discrimination requiring some explanation from the prosecutor.
In the second round, 6 of the 15 jurors were African American. After questioning of the second round of jurors was completed, the prosecutor peremptorily struck two African American jurors of the five jurors being considered. At that point, the prosecutor had made eight challenges, seven of which (87%) were against African Americans. The defense attorney then challenged the prosecutor’s striking of African Americans from the jury. While recognizing that a challenge could be made to the striking of even a single juror, the trial court *516 refused, to require an explanation of the prosecutor’s use of eight challenges to strike seven African Americans. The record indicates that four of seven seated jurors were African American when the challenges were made.
While the numbers alone established a prima facie case, the defense attorney presented additional reasons why the striking of African Americans could not be upheld. For example, as to the first prospective juror, the defense counsel stated that the juror had no prior jury experience, had no prior relations with the police, had two years of college and gave no answers that would call into question her qualifications to serve on the jury. Prospective juror number four had a Bachelor of Arts degree in psychology and gave no indication that he could not be fair. Another challenged prospective juror was a single woman with two years of college who helped her mother and brother at home and had no prior jury experience. A fourth prospective juror had worked at the Offtrack Betting Corporation for 30 years, had served on many juries and was not asked a single question by the prosecutor.
Both Batson and Kern require that a defense attorney or prosecutor seeking to challenge the peremptory jury strikes by the other must first establish a prima facie case of jury discrimination “by showing that the prosecution [or defense attorney] exercised its peremptory challenges to remove one or more members of a cognizable racial group from the venire and that there exist facts and other relevant circumstances sufficient to raise an inference that the prosecution used its peremptory challenges to exclude potential jurors because of their race” (People v Childress, 81 NY2d 263, 266 [1993]). The prosecution must then answer the challenge by giving race neutral reasons for the peremptory strikes. The court may then determine if those reasons are pretextual (People v Allen, 86 NY2d at 109-110).
A prima facie case may be established by statistical evidence alone, by a pattern of strikes, by questions and statements made by the. prosecution during voir dire, by comparing rejected African Americans to similarly situated Caucasians and by identifying excluded African Americans who, because of their background or experience, could be expected to favor the prosecution (see Batson v Kentucky, 476 US at 97; People v Hawthorne, 80 NY2d 873 [1992]; People v Bolling, 79 NY2d at 323-325). In Batson, the Court stated that in making a determination of whether or not a prima facie case had been made out, it should be remembered that those of a mind to discriminate will do so (476 US at 96).
*517 It is unquestionable that statistics alone may be a sufficient reason for requiring some explanation from a prosecutor. In People v Hawthorne (80 NY2d at 874), this Court modified an Appellate Division order by remitting the matter to the trial court. This Court agreed that defendant had made a prima facie showing of race discrimination in pointing to the fact that the prosecutor challenged four of six African American venire persons.* This Court remitted because the prosecutor was not asked to provide a racially neutral reason for one of the challenged jurors in question. This Court concluded that if a satisfactory explanation were provided by the People, the judgment of conviction should be amended to show the result. Otherwise, the judgment of conviction should be vacated and a new trial ordered.
In People v Bolling (79 NY2d at 322), 16 persons were originally put into the jury box. Five of the first 12 jurors were African American. The prosecutor peremptorily challenged five jurors, four African Americans and one Asian. The defense attorney then struck the other African American and three non-African American jurors. At this point, the defense attorney objected to the prosecutor’s challenges as racially motivated. The court did not rule on the challenges. The four remaining jurors of the original venire were seated; two of the four were African American. This Court remanded the case to Supreme Court for the People to provide race neutral reasons for their challenges, failing which, the conviction was to be vacated and a new trial ordered.
In People v Jenkins (75 NY2d 550, 556 [1990]), this Court agreed with the Appellate Division that a prima facie case of juror discrimination had been shown when the prosecutor used 10 peremptory challenges, 7 of which were used to strike 7 of the 10 African Americans on the venire, while only 3 challenges were used against the 37 non-African Americans.
The ruling by the Trial Judge that he did not believe a pattern had been shown that would require a prosecutor to respond with race neutral reasons was also in error. It is inconsequential that four African Americans had been chosen *518 to sit on the jury at the time the Batson challenge was made, and it makes no difference to the ruling challenged here that African Americans sat on the jury (People v Bolling, 79 NY2d at 321-322). The exclusion of a single juror based on race is impermissible (id.).
The differences between the majority and the dissent are clear. First, the majority contends that a prima facie case was not established. When the defense attorney made his challenge to the actions of the prosecutor, the record more than adequately established a prima facie case. It showed the number of African Americans among the first 30 prospective jurors and the prosecutor’s action in striking African Americans. In People v Bolling, this Court stated that a challenge on a racial basis did not have to wait until the end of jury selection but could, and should, be raised at any point during the process.
In People v Kern, the case in which this Court applied Bat-son to peremptory challenges by the defense, this Court upheld the action of the trial court in requiring race neutral reasons for peremptory strikes by the defendant in the midst of jury selection and without a requirement that the race of all prospective jurors be ascertained (75 NY2d 638 [1990], affg 149 AD2d 187, 222-237 [1989]). In fact, the prosecution argued, after the first round of jury selection, that the defense was striking prospective jurors on the basis of race. While that initial challenge was rejected by the trial court, the Batson challenge was upheld before the second round of jury selection was completed.
In People v Bennett (186 AD2d 812, 812 [1992]), the Appellate Division concluded that the “defendant has established a prima facie case of purposeful discrimination in the jury selection by the prosecutor, who exercised her peremptory challenges in the first three rounds of the voir dire to exclude 7 out of 11 [African Americans] from the jury, or nearly 64% of the prospective [African American] jurors. The prosecutor challenged only 36% of the non [African Americans] during those rounds * * The Court remanded the case for the prosecutor to give race neutral reasons for the challenges. On appeal after the remand, the Appellate Division reversed the conviction and ordered a new trial based on a determination that some of the prosecutor’s reasons for peremptory strikes were “pretextual, and insufficient” (People v Bennett, 206 AD2d 382, 384 [1992]).
In People v Vega (198 AD2d 56, 56 [1993], lv denied 82 NY2d 932), the People “established a prima facie case of purposeful *519 racial discrimination in the use of peremptory challenges when they established that the defense used 7 of its 8 challenges to exclude all but one of the white persons on the panel of 16.” In People v Harris (283 AD2d 520, 520 [2001]), the People “established a prima facie case of discrimination” when the “defense counsel peremptorily challenged four of the five remaining white venirepersons in the second round of jury selection.”
Moreover, a defendant is not obligated to include the race of all jurors in the entire panel from which jurors are to be selected before an adequate assessment of discriminatory practices can be made, even when a defendant is relying heavily or primarily upon the exclusion of a disproportionate number of persons of a particular ethnic group. Nor has this Court stated that there must be a comparison of the characteristics of African American jurors and Caucasians before an adequate assessment of a prima facie case can be made.
Second, the majority states that more than statistical evidence was needed here to make out a prima facie case. In several cases, this Court has stated that a disproportionate number of challenges against African Americans may be sufficient to raise an inference of jury discrimination (People v Childress, 81 NY2d at 267; People v Hawthorne, 80 NY2d at 874; People v Bolling, 79 NY2d at 324; People v Jenkins, 75 NY2d at 558). The striking of a disproportionate number of African Americans may also establish, prima facie, a pattern of strikes (Batson v Kentucky, 476 US at 97; People v Jenkins, 75 NY2d at 556). Moreover, the defense attorney went into the qualifications of at least some of the excluded prospective jurors. Those qualifications included the fact that none of the prospective jurors gave answers that would disqualify them from jury service. All appeared to be citizens with both work and educational experiences. Their qualifications indicated that they were not unsuited for jury service (see People v Jenkins, 75 NY2d at 556).
Third, as we enunciated in Kern, jury service is a civil right that only a court can protect at the trial stage. Of course, a defendant may still raise the issue of jury service as a civil right on appeal. Considering that we are dealing with the right of African Americans, as well as people of all races, to serve on juries, a constitutional civil right, establishing a prima facie showing of discrimination should not require more than what defendant established in this case. To require more is unwarranted, particularly when viewed in proportion to the minimal *520 showing (any racially neutral reason) required by the prosecutor to rebut the presumption of discrimination (see People v Allen, 86 NY2d at 109). As this Court stated in People v Jenkins:
“Surely, jurors dismissed because of their face will leave the courtroom with a lasting impression of exclusion from jury participation and perhaps of isolation from mainstream society generally * * *. No argument based on percentages of the population would remove from these excluded prospective jurors the sense of exclusion resulting from being assumed to be incompetent to sit on a jury solely because of their race” (75 NY2d at 558).
Since jury service is a civil right, courts have an obligation to see that persons are not excluded from juries on a racial basis.
Accordingly, both because the expert testimony rendered the trial unfair and because the prosecutor should have been required to give race neutral reasons for his exclusion of African Americans from the jury, I dissent.
Chief Judge Kaye and Judges Levine, Ciparick, Wesley and Rosenblatt concur with Judge Graffeo; Chief Judge Kaye concurs in a separate concurring opinion in which Judges Wesley and Rosenblatt concur; Judge Smith dissents and votes to reverse in another opinion.
Order affirmed.

 Specifically, this Court stated: “Defendant — pointing to the fact that the prosecutor peremptorily challenged four of the six African-American members of the venire — contends that he has made a prima facie showing that the prosecution exercised its peremptory challenges in a racially discriminatory manner, and that the burden therefore shifted to the prosecution to come forward with racially neutral reasons for the strikes (see, Batson v Kentucky, 476 US 79, 96; People v Bolling, 79 NY2d 317). We agree.” (Id.)