920 A.2d 736 (2007)
392 N.J. Super. 342
STATE of New Jersey, Plaintiff-Respondent,
v.
Miriam MIRABALLES, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 27, 2007.
Decided April 25, 2007.
*738 Yvonne Smith Segars, Public Defender, attorney for appellant (William Welaj, Designated Counsel, of counsel and on the brief).
Paula T. Dow, Essex County Prosecutor, attorney for respondent (LeeAnn Cunningham, Assistant Prosecutor, of counsel and on the brief).
Before Judges KESTIN, WEISSBARD and GRAVES.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
Defendant, Miriam Miraballes, appeals from her conviction and sentence, after a jury trial, on all counts of an indictment charging her as follows: conspiracy to commit burglary and theft, N.J.S.A. 2C:5-2, 18-2 and 20-2b(1)(e) (count one); burglary, N.J.S.A. 2C:18-2 (counts two, four and six); and, theft, N.J.S.A. 2C:20-2b(1)(e) (counts three, five and seven). Ramon Gonzalez was charged as a co-defendant on all the counts involving defendant.[1]
At sentencing the judge merged count one with counts two through seven, imposed concurrent five-year terms with two and one-half years of parole ineligibility on counts two and four, a concurrent five-year term on count seven, concurrent ten-year terms with five years parole ineligibility on counts three and five, and a consecutive five-year term with a two and one-half year parole disqualifier on count six. Thus, the aggregate sentence was fifteen years with a seven and one-half year period of parole ineligibility.
On appeal defendant raises the following arguments:
POINT I:

*739 THE DEFENDANT WAS DENIED HER RIGHT TO A FAIR TRIAL AS A RESULT OF THE TRIAL COURT'S ERRONEOUS RULING PERMITTING THE PROSECUTOR TO PRESENT HYPOTHETICAL QUESTION TO HIS EXPERT WITNESS, DETECTIVE QUINONES, DURING REDIRECT EXAMINATION, WHICH SPECIFICALLY REFERENCED THE DEFENDANT BY NAME. (Partially Raised Below)
POINT II:
THE DEFENDANT WAS DENIED HER RIGHT TO A FAIR TRIAL AS A RESULT OF THE PROSECUTOR'S ELICITATION OF TESTIMONY FROM HIS EXPERT WITNESS OPINING THAT A HIGH PRIESTESS, THE VERY POSITION THE STATE MAINTAINED WAS HELD BY THE DEFENDANT, WOULD NOT TESTIFY TRUTHFULLY IN COURT UNDER OATH. (Not Raised Below)
POINT III:
THE DEFENDANT WAS DENIED HER RIGHT TO A FAIR TRIAL AS A RESULT OF THE PROSECUTOR'S ELICITATION OF TESTIMONY FROM THE POLICE THAT THE DEFENDANT INVOKED HER RIGHT TO REMAIN SILENT FOLLOWING HER ARREST. (Partially Raised Below)
POINT IV:
THE TRIAL COURT FAILED TO ADEQUATELY INSTRUCT THE JURY REGARDING THE MANNER IN WHICH IT SHOULD ASSESS THE CREDIBILITY OF RAMON GONZALEZ. (Not Raised Below)
POINT V:
THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.
POINT VI:
ASSUMING THE COURT DOES NOT CONCLUDE THAT THE DEFENDANT'S SENTENCE WAS MANIFESTLY EXCESSIVE BASED UPON A REVIEW OF THE APPLICABLE AGGRAVATING AND MITIGATING FACTORS SUPPORTED BY THE RECORD, THE DEFENDANT IS ENTITLED TO A REMAND PURSUANT TO STATE V. NATALE.

After a detailed analysis of the record, we conclude that the issues presented in Points I and II require a new trial. We reject defendant's arguments in Points III and IV as without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2). However, defendant is free to seek a more complete instruction on credibility at the retrial. Because of our disposition, we have no need to address defendant's sentencing arguments, although it is clear that a resentencing would have been required in any event as a result of State v. Natale, 184 N.J. 458, 878 A.2d 724 (2005).

I
As the State agrees at the outset, this was a "hard fought trial." The gist of the State's case was that defendant conspired with co-defendant Gonzalez, who pled guilty and testified for the prosecution, to steal human remains from several cemeteries in Newark, for use in rituals associated with the non-traditional religion known as Palo Mayombe (Palo), of which defendant was alleged to have been a "high priestess."
The State's proofs had several elements. First, it established the actual thefts of human remains. Thus, an employee of the Mount Pleasant Cemetery testified to a burglary of the Jenkins mausoleum on December 18, 2001, and removal of human remains, as well as an entry to the *740 Schmidt mausoleum several years earlier. Similarly, there was evidence of a break-in of the Rovi mausoleum at the Holy Sepulchre Cemetery on January 23, 2002, and removal of human remains.
The next aspect of the State's case came from co-defendant Gonzalez, who testified in exchange for a promise of favorable treatment on charges pending in New Jersey, including this case, as well as the promise of assistance on charges pending against him in Florida. Gonzalez testified that he originally met defendant at a Botanica operated by her son at 250 Broadway in Newark. The Botanica was a store specializing in "spiritual" items for various non-traditional religions, including Palo and Santeria. Gonzalez attended ceremonies at defendant's house at which "sacrifices" would take place involving cauldrons containing human remains. At some point, Gonzalez left New Jersey for several years and went to Florida, returning here in November 2001, after jumping bail there. He resumed his relationship with defendant, who convinced him that his life would change for the better if he were initiated into the Palo religion.
Gonzalez claimed that defendant recruited him to steal human remains, which he effectuated, along with two other men supplied by defendant, on December 18, 2001, at Mount Pleasant Cemetery. After the theft, Gonzalez met defendant and transferred the bags containing the remains into her car. He received $100 from defendant. In January 2002, defendant again requested that Gonzalez enter a cemetery and steal human remains, promising to baptize him into the Palo religion if he did so. Defendant gave Gonzalez the name of the cemetery and the specific remains to be stolen. On January 23, 2002, Gonzalez accomplished his task at the Holy Sepulchre Cemetery. He had been driven there by his girlfriend, Ruth Santiago, who did not know of his criminal intent. The remains were turned over to defendant that night. Santiago's testimony confirmed these events. Although Gonzalez was promised $500, he never received it.
Apparently unknown to Gonzalez, Santiago was an FBI informant and told her contact agent about the cemetery theft. The agent, in turn, contacted the Newark Police Department who interviewed Santiago and then Gonzalez. When confronted, Gonzalez admitted his involvement, gave a statement, and agreed to cooperate.
Based on information provided by Gonzalez, a search warrant was obtained for a Botanica owned by defendant at 22 Bloomfield Avenue in Newark. The warrant was executed on August 13, 2002, and the results constituted the third strand of the State's case. Numerous items were seized from several rooms in the basement, including three cauldrons. The items were examined by a forensic anthropologist, Regina Hart, of the regional Medical Examiner's Office. Hart provided the following detail based on her analysis:
Cauldron one: A skull, which was missing the skull cap, an upper denture, a mandible and right humerus, which were the partial remains of Mr. Jenkinson.
Cauldron two: A skull, which was missing a skull cap was found. Ms. Hart concluded that it belonged to a white or Hispanic female who had died between the ages of thirty and fifty years of age. Partial remains of Mr. Jenkinson were also found in this cauldron.
Cauldron three: Two human skulls with the calvarium missing, a human calvarium skull cap and an unspecified long human bone. Some of these remains were also attributed to Mr. Jenkinson.
A purple cloth bag found next to cauldron one: numerous left and right leg and arm bones, several vertebra, several *741 foot bones, rib fragments, then mummified fingers, which also constituted the partial remains of Mr. Jenkinson.
A white satin pillowcase: contained a mandible with no teeth and dentures, several vertebra and ribs. Ms. Hart concluded these remains belonged to Mr. Schmidt.
A paper bag next to cauldron one: Two human skull caps, several vertebra and proximal fragments from a right tibia, as well as a skull cap belonging to an unknown juvenile. Ms. Hart concluded these remains belonged to Mr. Jenkinson and Mr. Schmidt.
In total, Ms. Hart identified five different individuals from the confiscated remains. The remains of Richard Jenkinson were found in cauldron one, two and three, a paper bag and the purple bag. The remains of Jacob Schmidt were also found at the scene.
In total, parts of at least five individuals were identified in the items taken from the basement.
The final thread of the prosecutor's case consisted of expert testimony, which we now discuss at length.

II
Defendant's first argument challenges the admissibility of the hypothetical question posed to Detective Marco Quinones of the New York City Police Department, the State's expert in non-traditional religions. In addition, defendant challenges the manner in which her name was ultimately presented to the jury during the re-direct testimony of Detective Quinones.
Detective Quinones was qualified by the judge "as an expert in nontraditional religions such as Santeria and Palo Mayombe." Defendant does not attack Quinones's qualifications in this regard. Asked to explain Santeria, Quinones testified:
Santeria is a religion that came into this country with the slave trade. It originated in Nigeria. Many of the tribes practiced a nature oriented religion. When they came into this country as slaves, they came into Cuba.
The plantation owners did not allow the slaves to practice their native religions and what the slaves did was disguise their religion, which was nature based, with the Roman Catholic Saints. In other words, they called the names of their demi Gods after the name of the Roman Catholic Saints; for example, Mary, Jesus, Paul, and so forth.
So when the plantation owners observed them jumping and praising the names of Roman Catholic Saints, in reality they pulled a fast one, and that way the plantation owners would leave them alone.
But the religion spread throughout the Caribbean into the United States and also into South America, and it has taken certain elements of Roman Catholicism even though the two religions are very, very separate and very unique to it.
Santeria has right now over a hundred million practitioners worldwide, five million in the United States, and over 300,000 in New York City.
With respect to Palo Mayombe, he testified:
Palo Mayombe is a religion that came from Zaire which is  well, the Congo, which is now Zaire. It is a nature oriented religion that worships three types of entities. They worship the dead, they worship ancestors, and they worship spirits of nature. It is considered by many practitioners of Santeria as the dark side because Palo basically works with spirits that are evil in their nature.

*742 And Paleros are very secretive. We cannot estimate the numbers, how many there are in the United States or worldwide because of the secretive nature of the religion itself.
Many Santeros will not incorporate any practices of Palo within their Santeria practices.
Shown a photograph of one of the cauldrons found at 22 Bloomfield Avenue, he identified it as an "Nganga," which "is the central focus point of the practice of Palo Mayombe." The cauldron, or pot, had traditional accoutrements of a Nganga, "various sticks containing various metal items and a chain which is wrapped around the pot." He went on to explain as follows:
When you're in Palo, especially when you are a high priest of Palo, when you get initiated as a high priest, you are given a pot which is called a Nganga. That pot has to be filled with various items that I shall describe.
It would have, for example, various dirts coming from different cemeteries; dirt from a cross road, and the reason, for example, that you use dirt from a cross road, because a cross road, if you can visually picture like any cross road, leads in many different directions.
In respect to Palo or some of the nontraditional religions, that cross road represents nature as we know it, earth; and the other aspect is the super natural, the world of spirits. So taking dirt from there is symbolically uniquely those two elements.
Also the sticks, the sticks is the core of Palo Mayombe.
. . . .
So, for example, I'm holding up this bag containing various sticks, and it's labeled sticks from cauldron one. This is one of the items that is placed inside the cauldron. This is where particularly the religion gets the name Palo. They believe that certain trees in the Congo had various Palo spirits that would give them power.
Also, they would add into the cauldron various animals, either dead chickens, dead roosters. For example, this bag, containing what is visually a dead chicken or rooster, all of these items will be placed inside, including human bones, and also a skull, if they can get their hands on a skull.
The items in the cauldron are not eaten, are not to be distributed to any other members. It is very sacred. You must feed this cauldron periodically blood of dead animals, and in some cases, from research that I have done, some people will feed it human blood from a human sacrifice.
The reason for that, because the spirit that you worship is inside that cauldron, that spirit can be a spirit of an ancestor of a dead person, of a criminal that has died a violent death, of a suicide person, or it can be a spirit of nature.
So you must keep that spirit very, very happy by feeding him or her the sacrifices, depending on what you want to give it, whether it's animal or human.
So that basically what you have here are the items that would be added to this cauldron. Every Palero will add their own ingredients. It is a matter of choice.
Directing Quinones's testimony to various human remains found at defendant's Botanica, the prosecutor asked the following hypothetical question and received the response indicated:

Q: Detective Quinones, I want you to assume that these all come from an individual who was buried in the 1930s in the Newark Cemetery or Mt. Pleasant Cemetery.

*743 Assume that he was buried in the 30s and then in December of the year 2001, an individual entered a mausoleum  he was buried in a crypt above-ground  destroyed the mausoleum, entered into the coffin and took these human remains.
Assume that this individual's name is Mr. Richard Jenkinson.
Can you tell the jurors what significance these human remains, the skull and these other remains of Mr. Jenkinson would have in relation to this cauldron, specifically if it is relevant, the date of his death and so forth?

A: It is very relevant. In Palo Mayombe, you must have, if you can get access to, a whole human structure. It is also believed in Palo that the longer a person has been buried, the more spiritual power that skeleton will have.
In some cases, they will send out someone to scope the cemeteries looking for people that have been buried for a very long time, in this case, 1930.
So the belief is that the longer the person has been buried, when you remove those items and use it in your cauldron, which will be placed inside the cauldron, it will have much more spiritual power.
So when you pray to Zaragunda or Oggun or any other spirit, that spirit, since it lives in the cauldron, is able to spiritually possess those items. For example, if you have the skull and other parts, now the spirit is able to think. If you have teeth, the spirit is able to speak.
So now you can send it to do your bidding and then when it comes back, you will reward it with either the blood of a rooster or blood coming from another organism.
So it's very  from my experience and expertise, it is very key that these items were placed inside of that cauldron.
Importantly, after Quinones provided his opinion as to the significance of other items found in the basement, the prosecutor propounded a hypothetical question to him which basically covered all of the State's proofs and took over ten pages of transcript. Because of its length, we will not further extend this opinion by quoting it in full. Rather, the complete question is annexed as a supplement hereto. In any event, the question concluded with the following, which we set out in full:

Q: Detective Quinones, in your opinion, can you give the jurors an opinion as to how the human remains of Richard Jenkinson ended up in the cauldron of 22 Bloomfield Avenue?

A: I believe that the remains got to that location because it was told of this [sic] individual to gather those items for the cauldron.
I believe that the 61-year-old Cuban woman has a lot of power within the religion of Palo Mayombe where she can give orders to certain individuals that are part of her group or are being initiated into the group and they respect that.

Q: Detective Quinones, would you have an opinion as to the hierarchy between the 50-year-old Cuban man who is operating Palo practices in his basement versus a 61-year-old woman who is operating out of a Botanica, but conducts her religious ceremonies off premises at Mt. Prospect and Summer Avenue?

A: At Palo Mayombe and Santeria, there's a high priest or high priestess which is considered like a parent. All the members pertaining to their small groupings must respect that high priest or priestess as a mother or father figure. All of these individuals to the high priest *744 or priestess are considered their children.
It is a bond that is even stronger than a normal family bond. In fact, as being part of any of these groups, you must put your real natural family to the side and give all of your respect to this new founded group.
So I believe that this woman plays the highest rank. She is the mother of this Palero group.
Quinones's reference to "the 61-year-old Cuban woman" was based on the prosecutor's repeated use of that description in the course of the hypothetical. Notably, there was no objection at that time to the hypothetical. Indeed, even on appeal, defendant does not challenge the hypothetical as posed on direct, but only the manner in which it was altered on re-direct. Thus, we turn to that sequence of events.
On cross-examination, defense counsel posed a counterhypothetical to Detective Quinones, adding to his initial assumption the following:

Q: Assume that separate and apart, a Cuban woman, who may or may not want to disclose her age at 61 years old, has been arrested in connection with the theft of human remains concerning two cemeteries that we know about, Mt. Pleasant, and assume that the other one with regard to that is owned and operated by the Archdiocese of Newark.
And assume that she is not a Palera, and assume that if she's not a Palera, she doesn't practice the evil Palo.
And assume that there was a search warrant for the premises of Miriam Miraballes, a Cuban lady; and assume that when Miriam Miraballes is detained before going into her private residence, she is arrested on the spot.
And assume that the arresting officers did not even go into her private residence, and assume that she does not know a fellow by the name of Oscar Cruz who is connected to 
[PROSECUTOR]: Judge, I have to object at this point.

Q: -22 Bloomfield Avenue.
At that point, an extensive discussion took place outside the jury's presence. The prosecutor pointed out a major inaccuracy in the defense hypothetical, in that there never was a search warrant for defendant's residence. The State asked that the entire hypothetical be stricken or at least that portion concerning the search warrant. With the prosecutor arguing that his use of the "61-year-old Cuban lady" was entirely appropriate, the following colloquy occurred:
[PROSECUTOR]: [Defense Counsel] asked the expert to opine specifically as to Miriam Miraballes at this particular point. When I'm given an opportunity to redirect, I do intend, based on his opening the door, to specifically give an opinion as to this particular defendant, which normally the State is not permitted to do.
Now I'm going to alter the facts of my hypothetical and substitute the name of Miriam Miraballes.
If he's permitted to do that, that's not a problem. The State is not permitted to, but since he has done it, I believe, under the law, I'm putting you on notice, this is what I intend to do, absent an instruction to the contrary. I'm going to insert the name Miriam Miraballes, the defendant, for the 61-year-old Cuban lady and ask the detective to give an opinion.
THE COURT: Except for one thing.
[PROSECUTOR]: What is that, Judge?
THE COURT: [Defense Counsel] has not yet asked the question. He is making assumptions.

*745 You're quite right, I think that's what-are you going to ask him, [Defense Counsel], whether or not she's guilty?
[DEFENSE COUNSEL]: Whether or not she can be connected to this whole theft of human remains.
After considerable additional discussion concerning what defendant could or could not do in terms of a hypothetical question, the prosecutor argued that counsel had opened the door to use of defendant's name in place of the "61-year-old Cuban lady," and the judge agreed. When the jury returned, the judge delivered the following instruction:
THE COURT: Okay, ladies and gentlemen of the jury, you heard [Defense Counsel] ask Detective Quinones to assume that the police obtained a search warrant for the home of defendant, Miriam Miraballes, and that the police executed that search warrant. There is no such evidence of that.
There's no evidence that the police did obtain a search warrant, and of course if they didn't obtain it, they didn't execute it.
I believe it was [Defense Counsel]'s misimpression that that occurred, but that had not occurred and so you're to disregard that portion of [Defense Counsel]'s question. And, you know, it's always-it's not the question that's evidence, it's the answer. An attorney's questions are not evidence. It's the answers of the witness that's evidence.
So I would ask you even to just ignore that aspect, even though it's not evidence, that aspect of [Defense Counsel]'s question that asked this witness to assume that there was a search warrant at the defendant's home and that it had been executed.
Upon resuming his cross-examination, defense counsel abandoned the hypothetical question and moved on to another line of questioning, concluding his examination shortly thereafter.
On redirect, the following took place:

Q: Okay. And, lastly, [Defense Counsel] asked you questions regarding whether or not his client, Miriam Miraballes, the defendant sitting here, is directly related to this human skull here and evil Palo. I'm going to ask you a question.
Previously I gave you a hypothetical and I 
THE COURT: Actually, that was not the question. The question was whether  not directly was she or wasn't she. The question was whether he was furnished with any evidence from any source connecting her to those items.
[DEFENSE COUNSEL]: That's right.
[PROSECUTOR]: All right.

Q: Detective Quinones, I had previously asked you a hypothetical, and I'm not going to repeat it, but in my hypothetical I always used the words 61-year-old Cuban woman.
I want you to substitute 61-year-old Cuban woman for the defendant sitting here, Miriam Miraballes, and just assume that Ramon gave the skull of Richard Jenkinson to Miriam Miraballes.
Approximately six to eight months later, that skull was found in the basement of a Botanica.
[DEFENSE COUNSEL]: Side bar.
THE COURT: He didn't finish the question. I'm going to let him finish the question.

Q: Assuming all the other facts that I have previously given you 
THE COURT: No, are you going to do that again, [Prosecutor]?
[PROSECUTOR]: No, just three facts that I need to assert.

*746 Q: Assuming the facts that I have given you that the Palero who ran this Botanica was a high priest, that Miriam Miraballes was a higher priest who operated her store where she ran only Santeria out of the Botanica, religious Palo Mayombe ceremonies off site.
Would you have an opinion then whether or not Miriam Miraballes had any direct connection to the Botanica where this human skull was, in fact, recovered?
THE COURT: You still have an objection?
[DEFENSE COUNSEL]: Objection.
At side-bar, defense counsel objected on the basis that "[the prosecutor]'s putting her into issue." However, the judge noted that since defense counsel "asked this witness questions about her connection," the prosecutor could not be precluded from "asking questions based on the question you asked." At that point, quite remarkably, defense counsel withdrew his objection and, under questioning by the judge, stated that he "could be" doing so "for strategic reasons." Whereupon, the prosecutor elicited the following from Quinones:

Q: Detective Quinones, knowing that the human skull that Ramon Gonzalez stole and gave to Miriam Miraballes ended up in the basement of the Botanica at 22 Bloomfield Avenue 
THE COURT: Now, if you assume that fact, [Prosecutor] meant to say.
Continue, [Prosecutor].

Q: Assuming that the skull that Ramon Gonzalez stole in the cemetery and gave to Miriam Miraballes ended up in the basement of the Botanica at 22 Bloomfield Avenue, would you have an opinion as to whether or not Miriam Miraballes has any connection to this Botanica, sir?

A: Yes, I do. Given those facts, I assume that there is a relationship with these people with each other and that relationship is based on their religious relationship, that each one of them has a position in this hierarchy within this group.

Q: And let me ask you, Detective Quinones, would the fact that the Botanica that you assume Miriam Miraballes ran was approximately a quarter of a mile away from the other Botanica either support or work against your opinion that they actually, in fact, knew each other and may have had a connection?

A: Yes, sir.

Q: And how would the fact that the two Botanicas in the same city were located so close together affect your opinion, sir, because of the type of practice this is?

A: It would strongly affect my opinion based on their relationship with each other.

Q: And why is that, sir?

A: Because the religion is very close-knit among its members and they want to be physically close to each other.
On appeal, defendant argues that she did not "open the door" to the prosecutor's use of her name in his hypothetical question, and that the use of her name was improper and highly prejudicial. While defendant does not complain about the original hypothetical question posed to Detective Quinones, we address it sua sponte.
The parameters of an acceptable hypothetical question posed to an expert in a criminal trial has been the subject of a number of cases beginning with State v. Odom, 116 N.J. 65, 560 A.2d 1198 (1989). All of the decisions, including Odom, involved drugs, and each came to the Court as a result of a dissent in the Appellate Division. See State v. Berry, *747 140 N.J. 280, 658 A.2d 702 (1995); State v. Summers, 176 N.J. 306, 823 A.2d 15 (2003). In Summers, supra, 176 N.J. at 312, 823 A.2d 15, the Court quoted the following from Odom, supra, 116 N.J. at 71, 560 A.2d 1198, as representing the "well-settled and straightforward" principles governing the admission of such expert testimony:
[T]he opinion of an expert can be admitted in evidence if it relates to a relevant subject that is beyond the understanding of the average person of ordinary experience, education, and knowledge. If the expert's testimony on such a subject would help the jury understand the evidence presented and determine the facts, it may be used as evidence. The witness offered as an expert must, of course, be suitably qualified and possessed of sufficient specialized knowledge to be able to express such an opinion and to explain the basis of that opinion. State v. Kelly, 97 N.J. 178, 208 [478 A.2d 364] (1984). Once it is determined that this testimony will genuinely aid the jury, it can be admitted. Id. at 208 n. 14 [478 A.2d 364]. Our Rules of Evidence codify these principles.
In Odom, the expert gave his opinion that the defendant possessed certain drugs with the intent to distribute them. Odom, supra, 116 N.J. at 69, 560 A.2d 1198. After concluding that the expert testimony was helpful to the jury, the Court addressed and rejected defendant's argument that the expert's opinion had expressed "a view of the criminal guilt of the defendant, and, for that reason, should have been withheld from the jury." Id. at 76-77, 560 A.2d 1198. While acknowledging that "an expert's testimony that expresses a direct opinion that defendant is guilty of the crime charged is wholly improper," id. at 77, 560 A.2d 1198, the Court expressed the rule as follows:
We therefore conclude that as long as the expert does not express his opinion of defendants guilt but simply characterizes defendant's conduct based on the facts in evidence in light of his specialized knowledge, the opinion is not objectionable even though it embraces ultimate issues that the jury must decide. [Id. at 79, 560 A.2d 1198.]
Even though "expressed in terms of ultimate issues of fact . . . the expert's opinion did not impermissibly constitute the expression of a view that defendant was guilty of the crime charged." Id. at 81, 560 A.2d 1198. Thus, the Court reversed the Appellate Division opinion that had barred the expert testimony. See State v. Odom, 225 N.J.Super. 564, 543 A.2d 88 (App.Div.1988).
As noted, State v. Berry also came to the Court based on a dissenting opinion in the Appellate Division, 140 N.J. at 283, 658 A.2d 702, while a companion case, State v. Cannon, arose from the Appellate Division's reversal of a pre-trial ruling barring the State from introducing certain expert testimony concerning drug distribution methods, 271 N.J.Super. 391, 638 A.2d 915 (App.Div.1994). After reviewing authorities from other jurisdictions, the Court concluded that expert testimony explaining the modus operandi of drug dealers is admissible. Berry, supra, 140 N.J. at 293-301, 658 A.2d 702. However, noting the concerns expressed by some courts, id. at 296-301, 658 A.2d 702, the Court cautioned trial courts to be sensitive to the risk of undue prejudice, particularly where the expert was "one of the investigating officers and also offers an opinion on the ultimate issue in the case." Id. at 301, 658 A.2d 702. The Court held that the testimony at issue in Berry and Cannon was admissible. Id. at 301-04, 658 A.2d 702.
Finally, Summers also arrived at the Court based on a dissent in the Appellate *748 Division, State v. Summers, 350 N.J.Super. 353, 368, 795 A.2d 308 (App.Div.2002) (Kestin, P.J.A.D., dissenting),[2] and, as with Odom and Berry, involved drug distribution. The Court made no new law but, rather, simply applied Odom to the underlying facts and concluded that the "testimony . . . fell within Odom's parameters." Summers, supra, 176 N.J. at 316, 823 A.2d 15. The Court saw "no compelling reason to reexamine Odom," which "is firmly grounded in New Jersey precedent and has been reflected in our Rules of Evidence for many years." Id. at 317, 823 A.2d 15. The Court rejected case law elsewhere that prohibits expert testimony concerning intent in drug cases. Ibid.
Two justices dissented in Summers, referring to many jurisdictions which prohibit such expert testimony. Id. at 320-22, 823 A.2d 15. The dissenters' opinion is best summed up in the following passage:
The distinctions made in Odom and now repeated by the majority are too insubstantial and ethereal for the mind to grasp. When an expert offers his opinion that a defendant possessed the drugs with intent to distribute-the very phrase by which the crime is defined, the jury knows that the expert has expressed his belief in the defendant's guilt, and no amount of semantic legerdemain can alter that conclusion.
[Id. at 320, 823 A.2d 15 (Albin, J., dissenting).]
Even more recently, Odom was reaffirmed in State v. Nesbitt, 185 N.J. 504, 888 A.2d 472 (2006), with the same two justices dissenting as in Summers.
The Odom, Berry, Summers trilogy, while generally supportive of the admission of expert testimony in criminal cases, does little to illuminate the question before us: whether Quinones's opinion, in response to the lengthy hypothetical question, that the "61-year-old Cuban woman" was responsible for having directed Gonzalez to "gather [the remains] for the cauldron" was within the bounds of proper expert testimony.
We do not question that Quinones's testimony was admissible, as helpful to the jury, to explain the Palo and Santeria religions and the meaning of and role played by different items and ceremonies in those religions. However, the hypothetical here did much more. It constituted a summation of the State's entire case and then elicited an opinion that the "61-year-old Cuban woman" was responsible for the cemetery thefts that constituted the bulk of the charges. Since many of the underlying facts were disputed, such as those resting on the veracity of Gonzalez, the question basically called on the expert to opine on the credibility of the State's case. See United States v. Benson, 941 F.2d 598, 603-04 (7th Cir.1991). The thinly-veiled reference to the "61-year-old Cuban woman" did nothing to dispel any error because it was clear beyond doubt who that person was. We conclude that the question and answer were erroneously admitted. The judge was correct when he noted his initial reaction to the question, that it came "close" to asking the witness for his opinion of defendant's guilt. While the judge concluded, on further review, that it did not do so, our review leads us to an opposite conclusion.
Nevertheless, as we noted earlier, defense counsel did not object to the question when it was posed. It was only later, *749 when the prosecutor sought to ask the hypothetical again, using defendant's name, that any objection was made. Here again, we disagree with the trial judge, and with the State on appeal, that defendant "opened the door" by using defendant's name in his aborted counter-hypothetical. The record is clear that, after the lengthy sidebar, the question was withdrawn and the hypothetical was not pursued. However, the judge only told the jury to disregard that portion of the question that referred, erroneously, to a search warrant for defendant's residence, when the entire question, including defendant's name, should have been stricken. But whether stricken or not, there was no basis in the record to then permit the prosecutor to insert defendant's name in place of the "61-year-old Cuban woman," and then ask for additional opinions based on the hypothesis that defendant directed Gonzalez to steal the human remains that ended up in her basement. This was error. Even when a hypothetical question is permitted, it is fundamental that a defendant's name should not be used. Odom, supra, 116 N.J. at 82, 560 A.2d 1198; Summers, supra, 350 N.J.Super. at 365, 795 A.2d 308. Yet, remarkably, defense counsel explicitly withdrew his objection to the re-direct testimony after the judge indicated it would be admissible.
Because of counsel's inaction, indeed acquiescence, we must assess defendant's claim under the plain error rule. R. 2:10-2.[3] In doing so, we note the Court's observation in Nesbitt, supra, 185 N.J. at 514-15, 888 A.2d 472:
Trial courts are expected to perform a gatekeeper role in determining whether there exists a reasonable need for an expert's testimony, and what the parameters of that testimony may be. Consistent with Evidence Rule 702, a trial court must be satisfied that the expert's knowledge and experience is reasonably required to inform the jury on a matter that may be beyond the jurors' ken and will help jurors understand the evidence or determine a fact in issue. Further, when the expert's testimony will include an opinion on an ultimate issue, see N.J.R.E. 704, a trial court must be satisfied that use of a hypothetical question is reasonably required and not unduly prejudicial. The failure of a defendant to object to expert testimony does not relieve the trial court of its gatekeeper responsibilities in either respect.
While the evidence against defendant was quite strong, the question is not whether the proofs are "overwhelming," as has sometimes been stated, but, rather, whether the offending evidence might have affected the jury's verdict. State v. Pillar, 359 N.J.Super. 249, 278-79, 820 A.2d 1 (App.Div.), certif. denied, 177 N.J. 572, 832 A.2d 322 (2003). We are satisfied that the expert opinions offered by Detective Quinones in response to the prosecutor's hypotheticals did have that capacity and were, therefore, not harmless. Our conclusion is fortified by the issue we next address.
On Quinones's re-direct, he was asked about the secretive nature of Palo, which is deemed by practitioners of other nontraditional religions, such as Santeria, to be an "evil religion." The following exchange occurred:

Q: In your opinion, would it be unusual for a high priest to come into court and testify and testify truthfully under oath with a court reporter regarding the *750 aspects of his Palo and his involvement in Palo?

A: The high priest or priestess will not testify to the truth of their true involvement in the religion and what the religion really is.
Once again, there was no objection, although the issue is now raised as error. We agree that it was highly improper to permit this witness to tell the jury, in effect, that in his opinion, a high priestess of Palo would not testify truthfully in court as to her involvement in the religion. Of course, Quinones had also expressed his opinion that defendant was such a high priestess. This testimony controverted the settled rule that a witness may not opine on the credibility of another witness, particularly a defendant, State v. Vandeweaghe, 177 N.J. 229, 239, 827 A.2d 1028 (2003) (quoting State v. J.Q., 252 N.J.Super. 11, 39, 599 A.2d 172 (App.Div. 1991), aff'd, 130 N.J. 554, 617 A.2d 1196 (1993)); State v. Papasavvas, 163 N.J. 565, 613, 751 A.2d 40 (2000). We reject the State's attempt to label defendant's argument as "far-fetched at best." While testimony simply opining on the secrecy of the religion, if probative, would not have been objectionable, this testimony went far beyond acceptable parameters. It put defendant in a position where before she ever testified-which she did not-she was labeled as untruthful. That is unacceptable.
Reversed and remanded for a new trial.

ATTACHMENT

STATE'S HYPOTHETICAL QUESTION TO DETECTIVE QUINONES

Q: Detective Quinones, I'm going to ask you a hypothetical question. At the end of this hypothetical question, I'm going to ask your opinion as it relates to Palo Mayombe.
Detective Quinones, I want you to assume that there is a man by the name of Ramon, that he's living in the City of Newark, and sometime around 1993, he meets an individual by the name of Mario, an individual by the name of Mario from Cuba. An individual by the name of Mario indicates to Ramon that he is a practitioner in Palo.
Sometime later, maybe four years later in 1997, the individual by the name of Mario introduces Ramon to a third party and for purposes of this question, I'm going to call her a 61-year-old Cuban woman.
Assume that Ramon meets the 61-year-old Cuban woman in a Botanica in the City of Newark at approximately five blocks from Mt. Pleasant Cemetery. The 61-year-old Cuban woman is working for her son, who owns the Botanica. Inside of this Botanica, religious items are sold. The number one sold item is religious statues; prayer cards are sold, candles are sold.
Inside of this Botanica, the owner employs at least three people who do readings for individuals who come in and they charge $21 for a reading. $7 goes to the owner of the Botanica, $14 going to the individual giving the reading.
Ramon speaks to the 61-year-old Cuban woman. She begins to do some cleansings for him. She does some readings for him. Sometime during their relationship, the 61-year-old Cuban woman trusts him, takes him outside of the Botanica to an address on Mt. Pleasant and Summer Avenue, which is a couple of blocks outside of Mt. Prospect Avenue.
When the 61-year-old woman takes Ramon to these two locations, Summer Avenue and Mt. Prospect, he is introduced to ceremonies which involve Palo Mayombe. Specifically at these *751 ceremonies, the 61-year-old Cuban woman would conduct these ceremonies. She would be what Ramon articulated as the high priestess in Palo Mayombe. According to Ramon, she has more Godsons in this area than any other practicing practitioner.
At these ceremonies, other Santeros will come and Paleros. At the end of these ceremonies, the 61-year-old Cuban woman will at times sell remains to other Paleros. This goes on for a couple of years and then at one particular point, Ramon decides to leave the State of New Jersey.
He goes to Florida, maybe around 1999, and while in Florida, he tries to establish himself in the construction business but is unsuccessful. He has a run-in with the law. He is arrested for a weapons' charge. He is arrested for cocaine charges.
Ramon Gonzalez  Ramon, we will just call him Ramon, is down on his luck. He is so down on his luck that he is unemployed and he has got the law chasing him. He decides to jump bail and leave the State of Florida without permission and reenters the State of New Jersey.
While down on his luck, he is living at his house, which is two blocks away from the Botanica that I previously described, and it's directly in between Mt. Prospect Cemetery and the Botanica where he met the 61-year-old Cuban lady.
Assume that while Ramon is back in the State of New Jersey and his luck is down, he is approached by an individual that says the woman wishes to speak to him. He is given a telephone number and he calls her and he, in fact, meets with the woman.
At this time, he meets with the woman and the woman says to Ramon, Ramon, you are down on your luck, and I'm going to give you an opportunity, I have the power to bring you good fortune. I have the power to take your bad luck that you have certainly seen and change it. I have the power to take your legal problems and make them disappear.
Ramon is a little bit intrigued. He continues to listen and the woman goes a little further and tells him, I have a son who is facing life in prison, or was at one particular time facing life in prison on prescription pills, and he came to me and I assisted him, and as a result of my assistance to my son, my son was able to alleviate his criminal justice problems.
Ramon, concerned about his criminal justice problems and his other luck, decides that this opportunity that is being offered to him is, in fact, a good opportunity for him to undertake.
She says to him, in order to be initiated into my religion, you are going to have to do a couple of things. One of the things I want you to do is to go to a cemetery. On the first occasion in December of the year 2001, around December 17th, the 61-year-old Cuban lady says to Ramon, on your first mission, I'm doing to send two men to you. These two men are going to be required to be driven to the cemetery. I want you to act as a look-out as the two men enter the cemetery.
Ramon, in fact, meets the two men. He drives them to the cemetery a couple of blocks from his house. He acts as a look-out. He had borrowed a car from a friend of his.
While waiting in the cemetery, the two men exit the car and go into the cemetery. Ramon loses sight of them. A short while later, the men return. They return with two bags. Ramon cannot see into the bags.

*752 The following morning, the cemetery caretaker wakes up and does his rounds at the cemetery, and lo and behold, he finds that the body of Kimberly and Richard Jenkinson are stolen that night from their final resting place.
It is determined that Kimberly and Richard Jenkinson both died in the early 1920s or 1930s.
In consideration for this work that Ramon does for the woman, the woman gives him $100, but doesn't give him $100 as payment, she gives it to him as a tip, and a tip so that she does not get bad luck for requiring him to go to the cemetery and assist.
Approximately one month later, the woman reapproaches Ramon and in order to get initiated into her religion asks him a second task. This second task, he is to go by himself this time and actually scale the fence of a separate cemetery in the City of Newark.
This time, he is given a piece of paper. On that piece of paper is a name. He is also given, besides the piece of paper with a name, instructions as to where the location of this next mausoleum is going to be.
Ramon, a little bit nervous, drinks a beer so he can get over his fear. He asks his girlfriend by the name of Ruth if she would be so kind as to drive him to the cemetery.
Ramon, knowing what he is about to do is a criminal act, tells his girlfriend, Ruth, that I'm going to ask you to drive me to the cemetery so I can pick up dirt. He is not going to tell her the true reason why he is going to the cemetery.
On January 23rd of the year 2002, Ruth borrows a pickup truck from a friend of hers. Ramon gets in the passenger seat, the two of them drive to the cemetery located in the City of Newark.
Ramon gets out a little bit intoxicated. He scales a high fence and asks Ruth to sit back behind and wait for him to return. He goes to the Rovi mausoleum. When he gets to the Rovi mausoleum, he takes a sledge hammer and he cracks a slate plate.
He pulls out a coffin, the coffin that contained the body of Joseph Rovi. He opens up the coffin and he takes the bag that the woman had given him and places the remains in a bag and he goes and leaves the cemetery.
The bag is too heavy, so he goes to a smaller fence. He throws the body over a smaller fence. He goes and sees his girlfriend, asks her to pull the car around to where the smaller fence is. He gets in the car.
After he gets into the car, he drives back to his mother's house, where he is to meet the woman. He calls the woman. The woman calls. At this particular point, the girlfriend still does not know what it is that Ramon had done.
The woman appears. She appears with a younger person. The younger person stays in her car, Ramon meeting the old woman. The two of them go to the car and they begin to take the remains of Joseph Rovi out of the truck.
At that particular point, the skull of Joseph Rovi is exposed from the bag that Ramon had placed him in. The girlfriend sees the skull, she begins to freak out. She is upset. She yells at Ramon. She keeps quiet and goes into the apartment.
Later on she learns why it was that Ramon had, in fact, stolen the human remains of Joseph Rovi.
This woman is so upset that she complains and she complains to friends of hers, and one of her friends goes to the FBI and tells the FBI the information they had regarding Ruth's involvement *753 in Ramon's theft. The FBI questioned Ruth. Ruth tells the FBI precisely what it is that she witnessed a couple of nights beforehand.
The FBI takes that information and they pick up Ramon and they question Ramon and Ramon tells the FBI precisely what happened, that I had been asked by a Cuban woman to go to the  the 61-year-old Cuban lady to steal these human remains. I did, in fact, do it and I gave those remains to her.
Ramon, sitting quietly for a while, he doesn't hear anything from any police. Approximately maybe six months later on August 6th, Ramon is visited by a Newark detective. The Newark detective informs him, Ramon, I have a federal statement from your girlfriend implicating you in the crime of theft in human remains.
At that particular point, Ramon gives up the whole job, names names, tells the detective who, in fact, was responsible and lays out the facts that I have just told you. He indicates that the individual asked him to do this, he had previously gone to ceremonies where she had sold human remains at the ceremonies.
Approximately one week later, Ramon is trying to work off these charges for the detective. He attempts to break into a Botanica, a separate Botanica, a Botanica that is located maybe five blocks from where the first Botanica was.
He's on the roof and he's going to break in and his purpose for breaking in is to take human remains from another Palero, an individual by the name of Oscar, who is approximately 11 years younger than the 61-year-old Cuban woman.
He is going to break in because he knows that this Palero has had human remains in his basement, and he wants to steal a skull so he can go back to the detectives, so he can say to the detective, look, I'm assisting you in your investigation, please be lenient on me for the information you have in terms of what I have done.
Based on this information, the detective is able to get a search warrant. He gets a search warrant. The following morning, he goes to that location, 22 Bloomfield Avenue, and lo and behold, when he gets to 22 Bloomfield Avenue, he finds in the basement of the Botanica one room; the first room is a large room with religious items. The second room is the room that the detective finds three cauldrons, similar to the one you have examined and talked to the jurors about, and two other cauldrons similarly situated.
Lo and behold in one of those cauldrons is found the skull, the lower jaw, the upper dentures, and along with them inside of the cauldron is Mr. Jenkinson, the remains he had stolen December 17th.
The next cauldron is a little bag with some other additional remains of Mr. Jenkinson, predominantly the rest of Mr. Jenkinson's body, his arms, his leg, his vertebrae, his ribs. Next to that bag of bones in the first room is a circular saw, a cheese grinder, and a meat grater.
Detective Quinones, in your opinion, can you give the jurors an opinion as to how the human remains of Richard Jenkinson ended up in the cauldron of 22 Bloomfield Avenue?

A: I believe that the remains got to that location because it was told of this *754 individual to gather those items for the cauldron.
NOTES
[1] The indictment contained fourteen counts in total. Counts eight, nine, ten and eleven charged Oscar Cruz and Mario Delgado with burglary, theft and conspiracy, while counts twelve, thirteen and fourteen charged Cruz alone with theft.
[2] The dissenting judge also authored the opinion in State v. Baskerville, 324 N.J.Super. 245, 735 A.2d 39 (App.Div.1999), certif. denied, 163 N.J. 10, 746 A.2d 456 (2000), which found expert testimony to have gone beyond the bounds permitted by Odom. Baskerville was also followed in State v. Singleton, 326 N.J.Super. 351, 741 A.2d 168 (App.Div.1999).
[3] It would seem pointless to remit defendant to post-conviction relief to demonstrate that her counsel was ineffective in failing to make objections that seem to us so patently meritorious.