**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5030-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LEVAR A. DAVIS, a/k/a
LEVAR DAVIS and CECIL
JONES,

    Defendant-Appellant.

_____

Submitted December 1, 2021 – Decided December 16, 2021

Before Judges Geiger and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-06-0388.

Joseph E. Krakora, Public Defender, attorney for appellant (Molly O'Donnell Meng, Assistant Deputy Public Defender, of counsel and on the brief).

William A. Daniel, Union County Prosecutor, attorney for respondent (Meredith L. Balo, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Levar Davis of two counts of possession of a controlled dangerous substance (CDS) and two counts of possession of CDS with intent to distribute.[1] Defendant contends that the State's expert invaded the province of the jury by testifying on the ultimate issue whether defendant possessed the CDS with intent to distribute and thereby improperly bolstered the evidence. We reject defendant's arguments concerning the expert testimony because the opinions offered in this case stayed within permissible bounds. Thus, we affirm defendant's convictions.

We derive the following facts from the evidence adduced at trial. On January 20, 2016, Detective Anthanasios Mikros of the Elizabeth Police Department (EPD) obtained a search warrant for a first-floor apartment in Elizabeth.[2]

Mikros and other members of the EPD Narcotics Division set up surveillance by remaining close by in unmarked vehicles. Ibid. After

___

[1] Defendant's notice of appeal stated he was also appealing an illegal sentence. Defendant withdrew that aspect of the appeal following his resentencing and the entry of an amended judgment of conviction while this appeal was pending.

[2] The parties stipulated that the issuance of the search warrant is not evidence of guilt of the defendants and that witnesses were not permitted to speculate as to why the search warrant was issued.

approximately an hour and a half, the officers observed codefendant Alphonse Anderson and another male exit the front door of the apartment. Once Anderson and the other male crossed Route 1, assisting units stopped them. Thereafter, Mikros directed the EPD Emergency Service Unit (ESU) to execute the search warrant. After breaching the door, no one was found in the apartment.

Mikros searched the bedroom on the right side. He found paperwork addressed to defendant and $454 atop a dresser. In a dresser drawer, Mikros found two Ziploc bags containing fifteen clear plastic bags of suspected marijuana tied in a knot. In the same drawer, he found another Ziplock bag containing sixteen clear plastic bags tied in a knot that were filled with suspected pentylone and cocaine.

EPD Lieutenant Robert Kelly searched the bedroom on the left side. In the top drawer of a dresser, Kelly found a box containing 450 envelopes of suspected heroin, a black pouch containing 16 clear bags containing suspected cocaine, and other empty bags. In the same drawer, Kelly found a sack containing $3,255. On top of the dresser, Kelly found paperwork, a paystub, and a prescription bottle in Anderson's name.

Police did not recover any drug paraphernalia inside the apartment, but EPD Carmine Gianetti found an Apple iPhone with a small bag of suspected

A-5030-18

marijuana on it in the living room. Gianetti found a digital scale, other plastic bags, and a bag of uncooked rice in a kitchen cabinet.

After evidence was found in a bedroom containing his mail, assisting officers arrested Anderson. A search incident to arrest revealed he had keys to the outer and inner doors to the apartment. Defendant was later stopped and arrested and found in possession of a key to the apartment.

The suspected CDS found in the apartment was tested by forensic chemist Suzanne Bryant of the Union County Prosecutor's Office Forensic Laboratory. The testing confirmed that the substances seized were CDS and determined the respective weights of the CDS. See Table One attached hereto.

A Union County Grand Jury returned an indictment charging defendant with third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a)(1) (count one); fourth-degree possession of CDS, N.J.S.A. 2C:35-5(a)(3) (count two); and two counts of third-degree possession of CDS with the intent to distribute, N.J.S.A. 2C:35-5(a)(1), 35-5(b)(3), and 35-5(b)(11) (counts three and four).

Defendant moved to suppress physical evidence seized during an investigatory stop and to disclose the identity of the State's confidential informant. The trial court denied both motions.

4

Defendant next filed motions for a <u>Franks</u>[3] hearing, to dismiss the indictment, and to suppress the evidence seized during the execution of the search warrant. The trial court denied all three motions.

On July 24, 2017, the State filed a motion in limine to bar the defense from introducing at trial any evidence that there was a judicially authorized search warrant or that defendant was the target of the search warrant. On August 3, 2017, the court denied the motion in part and granted it in part. The court allowed the parties to reference the search warrant but would not permit testimony regarding the identity of the target named in the search warrant.

Defendant moved in limine to bar introduction of a hospital record for defendant and the medical records and prescription bottle found in Anderson's bedroom, claiming they had not been timely supplied in discovery. The court denied the motion.

The three-day trial commenced on August 1, 2017. Aside from determining whether defendant possessed the CDS, the jury was asked to decide whether the drugs possessed by defendant were meant for personal use or distribution.

---

[3] <u>Franks v. Delaware</u>, 438 U.S. 154, 156 (1978).

Bryant testified for the State as an expert in forensic chemistry. She testified that testing confirmed the seized substances were CDS and determined the weight of various CDS seized by police. See Table One.

The State called Detective Kevin Kolbeck to testify as an expert in the field of production, packaging, use, and distribution of CDS. Kolbeck was a member of the Union County Prosecutor's Office Narcotics Strike Force for ten years and a detective for fourteen years. He received specialized training in narcotics investigations including narcotics techniques, undercover operations, controlled buys, narcotics packaging, and surveillance. As part of that training, Kolbeck attended Top Gun school, which covers operational schemes of low-level, mid-level, and high-level narcotics distribution. He had participated in "over a thousand" narcotics investigations. Kolbeck was qualified as an expert and the court instructed the jury that the Rules of Evidence permitted Kolbeck to render opinions which they could choose to believe or disregard depending on his credibility.

On direct examination, Kolbeck was asked to explain the components of different level of drug sales. He responded by discussing the various types of packaging used at each level (i.e., upper-level drug sales, mid-level drug sales, and street-level drug sales).

A-5030-18

Next, the prosecutor asked Kolbeck about the various drugs and the way they are commonly packaged and sold. Kolbeck explained the difference between powder cocaine and crack cocaine. He explained that typical dosages, measured by weight, "depend[] on the seller," but generally range between 0.03 to 0.07 grams. He also testified as to the approximate price for a typical dose.

The prosecutor asked: "In what form is crack cocaine typically sold from a mid-level dealer to a street-level dealer?" Kolbeck testified that typically, mid-level dealers sell powder cocaine to street-level dealers, and the street-level dealers "cook it up themselves." She then asked about sales at the street level. The prosecutor asked, "what is the typical way that street-level dealers sell powder cocaine to a buyer?" Kolbeck responded, in "[s]mall little Ziploc baggies." He indicated that powder cocaine is typically sold in quantities of at least a half a gram to a gram.

Next, the prosecutor asked Kolbeck general questions about heroin, including how it is ingested, common weights, pricing, packaging, and the forms in which it is sold by mid-level and street-level dealers. The same questions were posed regarding pentylone (commonly referred to as "Molly"), and marijuana. In response to a question about how street-level dealers sell pentylone, Kolbeck responded it is sold "individually" in "small little knotted

baggies" usually one, two, or three bags at a time. Specific to marijuana, Kolbeck testified that mid-level dealers would sell street-level dealers a large Ziploc bag which would then be packaged in smaller bags for individual sale to marijuana users, known as "dime bags."

The prosecutor asked Kolbeck, "[i]f someone [who was] using a particular residence just to inject or to smoke any of the following drugs, . . . what [do you] typically think you would find in the apartment[?]" Kolbeck responded that cocaine and heroin users can snort the drug right out of a bag unless they use a syringe, crack cocaine and marijuana users typically keep glass pipes and bongs, and pentylone users swallow or snort the substance.

Next, the prosecutor asked: "If someone was a drug addict, would it be normal for them to have [fifteen] packaged eighths of marijuana?" Kolbeck responded that it would not be normal since the user could buy a larger quantity cheaper than buying individual baggies. He explained that the same principal applied to crack cocaine, with it being cheaper to buy in wholesale quantities than in individual bags.

Kolbeck testified it would be unusual for someone addicted to heroin to have 450 glassine folds of heroin, which is "a lot." He explained that heroin

addicts typically don't have a lot of money and 450 glassine folds of heroin would be valued at $2,700 to $4,500 depending on the local street-level price.

Kolbeck also testified that it would be unusual for a user to have fifteen knotted bags of pentylone, explaining that it would be cheaper to buy a gram of it and beak off smaller pieces to swallow. Purchasing the pentylone in smaller quantities would cost double or triple the street-level price. Kolbeck testified that fifteen bags of pentylone would cost between $300 and $375.

One of the last questions on direct examination was, "if someone were using an apartment to package or sell drugs for street-level distribution, what would you expect to find inside of the apartment?" Kolbeck stated he would expect to find "[p]ackaging material, small little Ziploc baggies, glass vials, sandwich baggies, [and] scales . . . used to weigh the marijuana and . . . cocaine before its put into the Ziplock baggies." Someone selling heroin would typically have empty glassine folds and rice, which removes moisture from powder drugs like heroin. On cross examination, Kolbeck acknowledged there could be innocent reasons to have scales, bags, and rice in a kitchen.

Defendant did not object to any of the questions posed to Kolbeck or to any aspect of his testimony at trial.

9

The jury found defendant guilty of all four counts. Specifically, on count one, defendant was found guilty of possession of pentylone and cocaine but not guilty of possession of heroin. On count two, defendant was found guilty of possession of more than fifty grams of marijuana. On count three, defendant was found guilty of possession of pentylone with intent to distribute but not guilty of possession of heroin and cocaine with intent to distribute. On count four, defendant was found guilty of possession of one ounce or more of marijuana with intent to distribute.

Defendant was sentenced on January 12, 2018. On counts one, three, and four, defendant was sentenced to eight-year terms, subject to a four-year period of parole ineligibility. On count two, defendant was sentenced to an eighteen-month term. All terms were concurrent. The court also imposed the requisite fines, penalties, and surcharges. This appeal followed.

While this appeal was pending, defendant was resentenced. The conviction on count two, which charged possession of marijuana over fifty grams, was vacated by the trial court. In addition, count one, which charged possession of CDS, was merged for purposes of sentencing into count three, which charged possession of CDS with intent to distribute. The sentence on count three was reduced to a seven-year term, subject to a forty-two-month

10

period of parole ineligibility, and the sentence on count four was reduced to a concurrent five-year term, subject to a thirty-month period of parole ineligibility.

Defendant raises the following point for our consideration[4]:

> POINT I
>
> BECAUSE THE STATE'S EXPERT TESTIFIED ON THE ULTIMATE ISSUE OF DEFENDANT'S STATE OF MIND IN A DRUG POSSESSION CASE AND THE PROSECUTOR POSED A NUMBER OF QUESTIONS DESIGNED TO ELICIT AN OPINION THAT THE DEFENDANT POSSESSED DRUGS WITH THE INTENT TO DISTRIBUTE, THE JURY'S PROVINCE AS FACTFINDER WAS INVADED AND THE STATE'S FACT EVIDENCE WAS IMPROERLY BOLSTERED.

During the trial, defendant did not object to the questions posed to Kolbeck or his answers. For the first time on appeal, defendant argues that Kolbeck improperly testified on the ultimate issue of defendant's state of mind, i.e., whether defendant possessed the CDS with intent to distribute it.

When a party does not object to an alleged trial error or otherwise properly preserve the issue for appeal, it may nonetheless be considered by the appellate court if it meets the plain error standard of Rule 2:10-2. State v. Singh, 245 N.J.

---

[4] Defendant withdrew Point II of his brief following resentencing.

1, 13 (2021). The plain error standard requires a determination of: "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' R. 2:10-2; that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Dunbrack, 245 N.J. 531, 544 (2021) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)). If the error of omission does not meet that standard, it "shall be disregarded by the appellate court . . . ." R. 2:10-2. "The mere possibility of an unjust result is not enough." Funderburg, 225 N.J. at 79.

"[W]hen counsel does not make a timely objection at trial, it is a sign 'that defense counsel did not believe the remarks were prejudicial' when they were made." State v. Pressley, 232 N.J. 587, 594 (2018) (quoting State v. Echols, 199 N.J. 344, 360 (2009)). The absence of objections "weighs against [the] defendant's claim that errors were 'clear' or 'obvious.' Indeed, '[i]t [is] fair to infer from the failure to object below that in the context of the trial the error was actually of no moment.'" State v. Nelson, 173 N.J. 417, 471 (2002) (alterations in original) (quoting State v. Macon, 57 N.J. 325, 333 (1971)).

Detective Kolbeck testified as an expert in the packaging, sale, and distribution of narcotics in a general nature and did not invade the jury's province as factfinder. Kolbeck offered the jury contextual information to allow

them to evaluate the evidence presented and reach a conclusion as to whether defendant possessed the drugs in his apartment for personal use.

Defendant argues that Kolbeck's expert testimony improperly "opined on [defendant's] state of mind a number of times" and lists nine portions of Kolbeck's testimony that allegedly impeded the jury in deciding the ultimate issue of whether defendant possessed the drugs in his apartment for personal use or with intent to distribute them. The cited questions and answers are:

> Q: [W]hat is the typical way that street-level dealers sell powder cocaine to a buyer?
>
> A: Small little Ziploc baggies . . . It could be also - - whatever they could put the -- half a gram to a gram in and seal it properly.
>
> Q: So . . . powder cocaine is typically only sold at least half a gram to a gram?
>
> A: Yes.
>
>     . . . .
>
> Q: Okay. And in what form is pentylone sold by the mid-level dealers to the street-level dealers?
>
> A: . . . [I]t could be 50 grams, 100 grams. Ten grams. And then again it's packaged into small little knotted baggies or . . . capsules.
>
> Q: Okay. And then from a street-level dealer to a buyer, how is that pentylone sold?

13

A: Individually . . . [o]ne or two, three [capsules].

. . . .

Q: What is the approximate price for a serving or hit of marijuana? Or since you just said a . . . dime bag or an eighth, what's the approximate price for a dime bag?

A: Ten dollars. That's [why] they call it a dime bag because it's a ten-dollar bag.

Q: Okay. And then what's the approximate price for an eighth?

A: Approximately $50.

Q: Okay. And in what form is marijuana typically sold from a mid-level dealer to a street-level dealer?

A: It could be [a] half a pound. It could be . . . ounces. And, like I said, it all depends on the street-level dealer[,] how much they have and how much they order up.

Q: Okay.

A: But it be a half a pound. It could be four or five ounces.

Q: And is there a typical form that a buyer from a street-level dealer would buy of marijuana?

A: The street-level dealer would buy . . . larger Ziploc baggies . . . [s]old to them from the mid-level dealers.

. . . .

14

Q: [H]ow would a street-level dealer sell marijuana to a buyer?

A: Oh, small little Ziploc baggies. Small -- they're little dime bags are very, very small. And then you get into your larger Ziploc baggies which would hold . . . the eighth and so on.

    . . . .

Q: Someone that is personally using crack cocaine, what would you expect to find in their apartment?

A: Small pipes. Like your glass pipes that they use to smoke . . . marijuana. And that's . . . typically for . . . crack cocaine.

    . . . .

Q: What about marijuana, somebody that is smoking marijuana, what would you expect to find in their apartment?

A: It would be a bong. It could be pipes. Rolling paper. It could be blunts . . . they would cut the blunt in half. They would take out the tobacco which you would [find] residue and tobacco in the garbage can or on . . . the table. And then the marijuana is put inside the blunt and then rolled up.

    . . . .

Q: If someone was a drug addict, would it be normal for them to have [fifteen] packaged eighths of marijuana?

A: No.

Q: Why not?

A: Just because of the quantity. It's just like if you go to the store and you buy [fifteen] eight-ounce water bottles, you're spending much more in regards to just buying a gallon. They're spending much more. And plus the packaging nowadays it's not an open-sale market. Meaning you could just go on the street and everybody has cell phones. So instead of going up to that individual, you could call them and . . instead of ordering [fifteen] bags of eighths, you could say, I would like an ounce, or I would like two ounces. That mid[-level] dealer or street-level dealer would then package it in the proper way and distribute there instead of . . . selling [fifteen] Ziploc baggies.

Q: Okay. What about would it be unusual for someone who's a drug addict to possess [sixteen] small [b]aggies of rocklike cocaine?

A: Yes. Because of the same reason. Again, you could buy more that's cheaper it if you buy it more wholesale than buying [fourteen] bags of . . . crack cocaine.

. . . .

Q: Now, Detective, if someone were using an apartment to package or sell drugs for street-level distribution, what would you expect to find inside of the apartment?

A: Packaging material, small little Ziploc baggies, glass vials, sandwich baggies, scales which are . . . used to weigh the marijuana and to weigh the cocaine before it's put into the Ziploc baggies.

Q: Okay. Is there anything that you would expect to find if the sale of heroin were occurring in a residence?

16

A-5030-18

A: Yes. Empty glassine folds that are typically [what] it's packaged in. Sometimes you see rice. What rice does is the user they want it [to be] powder. They don't want it moist. So what [rice] does it sucks out the moisture in regard to the heroin. So there's times that we find heroin . . . inside of rice because it keeps the moisture out. And the users that are typically buying it to snort it, they don't want it sticky because then obviously they can't snort it and it sticks to . . . the glassine folds and they're not able to snort it properly.

Relying on State v. Cain, 224 N.J. 410, 429 (2016) and State v. Simms, 224 N.J. 393, 396 (2016), which prohibit expert opinions on a defendant's state of mind and limit long hypothetical questions, he argues that Kolbeck effectively told the jury that defendant possessed more than sixty-eight grams of marijuana and more than fifteen grams of pentylone with the intent to distribute when he opined that a marijuana or pentylone user would normally only possess one to three capsules of pentylone or a dime bag of marijuana at a time and would not stockpile greater amounts of the drugs. We disagree because, in this case, the drug expert's testimony stayed within permissible bounds and did not offer an opinion on defendant's state of mind.

Trial courts have considerable discretion in acting as gatekeepers to determine whether to allow expert testimony and the scope of such expert testimony. Townsend v. Pierre, 221 N.J. 36, 52 (2015) (citing State v. Berry, 140 N.J. 280, 293 (1995)). If an objection is made, appellate courts use an abuse

of discretion standard in reviewing the admission of expert testimony.  Id. at 52-53.  "[A] trial court's evidentiary rulings are entitled to deference absent . . . a clear error of judgment."  State v. Nantambu, 221 N.J. 390, 402 (2015) (alteration in original) (quoting State v. Harris, 209 N.J. 431, 439 (2012)).  Here, however, we review for plain error given the absence of objection.

Expert testimony is permissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," N.J.R.E. 702, if the "testimony concerns a subject matter beyond the ken of an average juror," State v. Reeds, 197 N.J. 280, 290 (2009).  Generally, expert testimony "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  N.J.R.E. 704.  Although expert testimony in drug cases is allowable, it is subject to certain limitations.  Cain, 224 N.J. at 426-27; Simms, 224 N.J. at 403-04.

> [E]xpert testimony on the ultimate issue of whether a defendant intended to distribute drugs is permissible only if it "will assist the trier of fact to understand the evidence or determine a fact in issue," N.J.R.E. 702, and "may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice," N.J.R.E. 403; State v. Sowell, 213 N.J. 89, 100 (2013).
>
> [Cain, 224 N.J. at 421 (alteration in original).]

For example, experts can explain how drug traffickers package and process drugs for distribution. Id. at 426. Experts can also explain the quantities and concentration of drugs, the value of drugs, the use of identifiable logos and drug packaging, and the function of drug paraphernalia. Ibid. "Experts may also provide insight into the roles played by individuals in street-level drug transactions . . . and into the various machinations used by drug dealers to thwart detection." Ibid. (citations omitted).

> The average juror is not knowledgeable about the arcana of drug-distribution schemes. Law enforcement officers with extensive training, education, and experience of the drug world have "specialized knowledge [that] will assist the trier of fact to understand the evidence or determine a fact in issue." N.J.R.E. 702. Experts can help jurors understand the indicia of a distribution operation, such as how drug traffickers package and process drugs for distribution.
>
> [Ibid. (alteration in original) (citing State v. Odom, 116 N.J. 65, 73-75 (1989)).]

Nevertheless, drug experts "should not express an opinion on matters that fall within the ken of the average juror or offer an opinion about the defendant's guilt." Ibid. (citing State v. Nesbitt, 185 N.J. 504, 512-14 (2016)). "Nor should an expert be used to bolster a fact witness's 'testimony about straightforward, but disputed, facts.'" Id. at 426-27 (citing State v. McLean, 205 N.J. 438, 455 (2011)).

19

The Court directed that "[g]oing forward, in drug cases, an expert witness may not opine on the defendant's state of mind. Whether a defendant possessed a controlled dangerous substance with the intent to distribute is an ultimate issue of fact to be decided by the jury." Id. at 429. The Court explained:

> We have come to the conclusion that an expert is no better qualified than a juror to determine the defendant's state of mind after the expert has given testimony on the peculiar characteristics of drug distribution that are beyond the juror's common understanding. In drug cases, such ultimate-issue testimony may be viewed as an expert's quasi-pronouncement of guilt that intrudes on the exclusive domain of the jury as factfinder and may result in impermissible bolstering of fact witnesses. The prejudice and potential confusion caused by such testimony substantially outweighs any probative value it may possess.
>
> [Id. at 427-28.]

The Court also limited the use of hypothetical questions. Id. at 429. "When the evidence is straightforward and the facts are not in dispute, there is no need to resort to a hypothetical." Ibid. And, "[t]o the extent possible, questions posed to an expert witness in a drug case should be compact and easy to understand and should not take the form of a summation." Id. at 430.

Measured against these standards, we discern no abuse of discretion, much less plain error, in allowing the State's expert testimony in this case. Kolbeck

20

did not offer any opinion concerning defendant's state of mind or defendant's intent. The expert testimony was appropriately limited to explaining to the jury how CDS is typically packaged, the value of bags of CDS seized, and how a street-level drug transaction might occur. Kolbeck was not asked whether defendant had or did not have an intention to distribute the CDS. Nor was he asked any impermissible hypothetical questions about the facts of the case.

The State's expert expressed no conclusion regarding defendant's intent, the ultimate issue on counts three and four. Instead, the State's expert stayed well within the bounds of permissible testimony by a drug expert, providing general background information that would allow the jury to understand drug transactions in general. The jury was then left free to make the ultimate determination of whether defendant possessed the CDS with the intent to distribute. Moreover, the absence of objection and the jury's verdict in this case lead us to conclude that Kolbeck's testimony did not lead the jury to a result it otherwise might not have reached. Indeed, while the jury found defendant guilty of possession of cocaine, it found him not guilty of possession of cocaine with intent to distribute.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21

TABLE ONE

LOCATIONS, SUBSTANCES, AND WEIGHTS OF SEIZED CDS

| Exhibit | Location Found | Substance | Weight |
|---------|----------------|-----------|--------|
| S-1 | Living Room | Marijuana | 0.472 grams |
| S-6 | Anderson's Bedroom | Heroin | 13.461 grams |
| S-7.1 | Anderson's Bedroom | Cocaine | 1.278 grams |
| S-7.2 | Anderson's Bedroom | Cocaine | 0.347 grams |
| S-16.1 | Defendant's Bedroom | Marijuana | 68.762 grams |
| S-16.2 | Defendant's Bedroom | Marijuana | 29.757 grams |
| S-18.1 | Defendant's Bedroom | Pentylone | 12.195 grams |
| S-18.2 | Defendant's Bedroom | Pentylone | 3.045 grams |
| S-18.3 | Defendant's Bedroom | Cocaine | 0.429 grams |

A-5030-18